**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, BY JOSH SHAPIRO, ATTORNEY GENERAL; PENNSYLVANIA DEPARTMENT OF INSURANCE, BY JESSICA K. ALTMAN, INSURANCE COMMISSIONER AND PENNSYLVANIA DEPARTMENT OF HEALTH, BY RACHEL LEVINE, SECRETARY OF HEALTH | : : : : : : : : : : : | No. 39 MAP 2019 |
| | : : | Appeal from the Order of the Commonwealth Court, dated April 3, 2019, at 334 MD 2014. |
| v. | : : : | ARGUED: May 16, 2019 |
| UPMC, A NONPROFIT CORP.; UPE, A/K/A HIGHMARK HEALTH, A NONPROFIT CORP. AND HIGHMARK, INC., A NONPROFIT CORP. | : : : : : : : | |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA, BY JOSH SHAPIRO, ATTORNEY GENERAL | : : : : | |

**OPINION**

**JUSTICE WECHT**                                          **DECIDED: May 28, 2019**

Before this Court is the latest manifestation of a longstanding dispute between UPMC; UPE, a/k/a Highmark Health and Highmark, Inc. (collectively, "Highmark"); and the Commonwealth's Office of the Attorney General ("OAG") regarding the parties' rights and obligations under a pair of Consent Decrees that, since 2014, have governed the relationship between UPMC and Highmark with regard to the provision and financing of

certain healthcare services to their respective insurance subscribers. The Consent Decrees currently are scheduled to terminate on June 30, 2019.[1]

A thorough recitation of the circumstances leading to the drafting of the Consent Decrees may be found in this Court's first decision interpreting their provisions. *See Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441 (Pa. 2015). Accordingly, we will not reproduce here the extensive background underlying this litigation. However, because our second case implicating the Consent Decrees, *Commonwealth by Shapiro v. UPMC*, 188 A.3d 1122 (Pa. 2018) ("*Shapiro I*"), features prominently in both the reasoning of the lower court and the arguments of the parties, a brief examination of that decision is warranted at the outset.

## I.   *Shapiro I*

At issue in *Shapiro I* was UPMC's obligation under the "Vulnerable Populations" provision of its Consent Decree to be "in a contract" with Highmark for the provision of healthcare services, at negotiated "In-Network" rates, to Highmark's Medicare Advantage ("MA") subscribers through the end date of the Consent Decrees, as required by our holding in *Kane*. *See Kane*, 129 A.3d at 469-70; *Shapiro I*, 188 A.3d at 1124.[2]  UPMC

---

[1]     *See* UPMC Consent Decree § IV(C)(9); Highmark Consent Decree § IV(C)(9) ("This Consent Decree shall expire five (5) years from the date of entry.").

[2]     We reached this conclusion in *Kane* based upon the language of the Vulnerable Populations provision that "UPMC shall treat all Medicare participating consumers as In-Network regardless of whether they have Medicare as their primary or secondary insurance." *Kane*, 129 A.3d at 448-49 (quoting UPMC Consent Decree § IV(A)(2)). Rejecting UPMC's contention that "Medicare participating consumers" did not include Highmark's MA subscribers, we approved the Commonwealth Court's interpretation based upon extrinsic evidence that MA subscribers were included within the phrase. *Id.* at 466-67. Further observing that MA subscribers were enumerated in the Consent Decrees' definition of vulnerable populations, that the purpose of the provision was to afford protection to such vulnerable populations, and that the Consent Decrees' definition of "In-Network" necessitated the existence of a contract for negotiated rates, we held that the lower court correctly determined that UPMC was required to be "in a contract" with

signaled its intent to rely upon a six-month "runout" provision of its existing MA Provider Agreements, which, by its terms, would obligate UPMC "to continue to abide by the same terms and conditions of the Provider Agreement for six months following the end of the final annual renewal period." *Shapiro I*, 188 A.3d at 1125. Under UPMC's understanding of its Consent Decree and this Court's decision in *Kane*, upon its termination of the Provider Agreements on December 31, 2018, the runout provision would be triggered, thus continuing to bind UPMC to all of their terms until June 30, 2019, upon which date UPMC would satisfy its obligations under its Consent Decree.

OAG filed a Petition to Enforce the Consent Decrees, averring that the runout provision was insufficient to satisfy UPMC's obligations, that the Provider Agreements therefore could not be terminated before June 30, 2019, and further that, because the Provider Agreements renewed on an annual basis, the earliest possible termination date would be December 31, 2019, with the runout provision then binding UPMC to their terms until June 30, 2020—one year beyond the end date of the Consent Decrees. The Commonwealth Court, in a single-judge order and memorandum, granted OAG's Petition to Enforce and ordered that UPMC would remain bound to the terms of the Provider Agreements through the end of the calendar year 2019.

UPMC appealed the Commonwealth Court's order to this Court, and we reversed. We held that UPMC's proposed invocation of the runout clause would satisfy its obligation to be "in a contract" with Highmark through June 30, 2019. Under the language of the runout provision, we noted, it "seems self-evident that UPMC is in a contract to provide in-network access during the first six months of 2019." *Id.* at 1134. When read as a whole, the Provider Agreements "mandate in-network access to UPMC facilities through

---

Highmark that established negotiated rates for treatment of Highmark's MA subscribers through the term of the Consent Decrees. *Id.* at 469-70.

the first half of 2019, thus satisfying the substantive requirement of the Consent Decree that UPMC 'treat those participants in Highmark [MA Plans] as In-Network.'" *Id.* at 1135 (quoting *Kane*, 129 A.3d at 469) (bracketed material in original; internal quotation marks omitted).

In a passage that is a subject of dispute in the instant case, this Court noted that our "primary hesitation" with the Commonwealth Court's order was that it "alters an unambiguous and material term of the Consent Decree—the June 30, 2019 end date." *Id.* at 1132. We found "no basis upon which to alter this unambiguous date, to which the parties agreed, and correspondingly, no foundation for ordering the renewal of the Provider Agreements for the entirety of the 2019 calendar year." *Id.* at 1134.

## II.    Background and Procedural History

Following our decision in *Shapiro I*, on February 7, 2019, OAG filed in the Commonwealth Court a four-count Petition to Modify Consent Decrees ("Petition"), thus commencing the instant litigation.[3] Invoking its *parens patriae* authority, OAG centrally averred that UPMC has departed from its mission as a charitable nonprofit healthcare institution, and that, negotiations with UPMC having failed, court-ordered modifications to the Consent Decrees thus are necessary to protect the public interest. OAG's requested relief is grounded in the language of the Consent Decrees that contemplates modifications thereof, which, as set forth in UPMC's Consent Decree, provides as follows:

> 10. **Modification** — If the OAG, PID, DOH or UPMC believes that modification of this Consent Decree would be in the public interest, that party shall give notice to the other and the parties shall attempt to agree on

---

[3]    The Consent Decrees provide that jurisdiction is retained by the Commonwealth Court "to enable any party to apply . . . for such further orders and directions as may be necessary and appropriate for the interpretation, modification and enforcement" of the Consent Decrees. UPMC Consent Decree § IV(C)(11); Highmark Consent Decree § IV(C)(11).

a modification. If the parties agree on a modification, they shall jointly petition the Court to modify the Consent Decree. If the parties cannot agree on a modification, the party seeking modification may petition the Court for modification and shall bear the burden of persuasion that the requested modification is in the public interest.

UPMC Consent Decree § IV(C)(10) (the "Modification Provision").[4, 5]

At Count I, OAG sought eighteen modifications to the Consent Decrees pursuant to the Modification Provision.[6] Most importantly to the instant dispute, OAG requested a

---

[4] The "PID" and "DOH" refer to Pennsylvania Department of Insurance and the Pennsylvania Department of Health, respectively. Although named as appellants herein, neither Department is participating in this litigation.

[5] Highmark's Consent Decree contains a parallel Modification Provision. *See* Highmark Consent Decree § IV(C)(10). For ease of discussion, and because OAG sought to modify both UPMC's and Highmark's Consent Decrees, we will refer to the Modification Provision in the singular.

[6] Seeking to bind both UPMC and Highmark as "respondents," the modifications requested in OAG's Petition were as follows:

(a) Imposing internal firewalls on the respondents that prohibit the sharing of competitively sensitive information between the respondents' insurance and provider subsidiaries; (b) Imposing upon the respondents' health care **provider** subsidiaries a "Duty to Negotiate" with any health care insurer seeking a services contract and submit to single, last best offer arbitration after 90 days to determine all unresolved contract issues; (c) Imposing upon the respondents' health care **insurance** subsidiaries a "Duty to Negotiate" with any credentialed health care provider seeking a services contract and submit to single, last best offer arbitration after 90 days to determine all unresolved contract issues; (d) Prohibiting the respondents from utilizing in any of their provider or insurance contracts any practice, term or condition that limits patient choice, such as anti-tiering or anti-steering; (e) Prohibiting the respondents from utilizing in any of their provider or insurance contracts any "gag" clause, practice, term or condition that restricts the ability of a health plan to furnish cost and quality information to its enrollees or insureds[;] (f) Prohibiting the respondents from utilizing in any of their provider or insurance contracts any "most favored nation" practice, term or condition; (g) Prohibiting the respondents from utilizing in any of their provider or insurance contracts any "must have" practice, term or condition; (h) Prohibiting the respondents from utilizing any "provider-based" billing practice, otherwise known as "facility-based" or "hospital-based" billing; (i) Prohibiting the respondents from utilizing in any of their provider or

modification "[e]xtending the duration of the modified Consent Decrees indefinitely." Petition at ¶ 75(r).

At Count II, OAG alleged that UPMC has violated the Solicitation of Funds for Charitable Purposes Act, 10 P.S. §§ 162.1-162.24. *See* Petition at ¶¶ 85-97. At Count III, OAG alleged that UPMC has breached its fiduciary duties of loyalty and care owed to its constituent healthcare providers and to the public-at-large, in violation of provisions of the Nonprofit Corporation Law, 15 Pa.C.S. §§ 5101-6162, and the Uniform Trust Act, 20 Pa.C.S. §§ 7701-7790.3. *See* Petition at ¶¶ 98-110. At Count IV, OAG alleged that UPMC has violated the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 - 201-9.3. *See* Petition at ¶¶ 111-125.

---

insurance contracts any "all-or-nothing" practice, term or condition; (j) Prohibiting the respondents from utilizing in any of their provider or insurance contracts any exclusive contracts or agreements; (k) Requiring the respondents' health care provider subsidiaries to limit charges for all emergency services to Out-of-Network patients to their average In-Network rates; (l) Prohibiting the respondents from terminating any existing payer contracts prior to their termination dates for anything other than cause; (m) Requiring the respondents' health care insurance subsidiaries to pay all health care providers directly for emergency services at the providers' In-Network rates; (n) Prohibit the respondents from discriminating against patients based upon the identity or affiliation of the patients' primary care or specialty physicians, the patients' health plan or utilization of unrelated third-party health care providers; (o) Requiring the respondents to maintain direct communications concerning any members of their respective health plans being treated by the other's providers; (p) Prohibiting the respondents from engaging in any public advertising that is unclear or misleading; (q) Requiring the respondents to replace a majority of their respective board members who were on their respective boards as of April 1, 2013 by January 1, 2020, with individuals lacking any prior relationship to either respondent for the preceding five (5) years; and (r) Extending the duration of the modified Consent Decrees indefinitely.

Petition at ¶ 75(a)-(r) (emphasis in original).

Highmark filed a response to OAG's Petition, through which it agreed to the proposed modifications set forth at Count I, provided that any such modifications apply equally to both UPMC and Highmark. Highmark denied, however, that it has engaged in misleading marketing tactics as alleged in OAG's Petition.[7]

UPMC did not assent to the proposed modifications. Rather, UPMC filed a responsive pleading asserting that OAG's claims are insufficient as a matter of law, *i.e.*, preliminary objections in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(4). As relevant herein, UPMC asserted that OAG's proposed modifications are not permissible under the Modification Provision, that the Consent Decree "cannot be extended through nonconsensual 'modification,'"[8] and that OAG, therefore, "seeks an invalid modification."[9] UPMC further argued that OAG's claims are barred as a matter of law inasmuch as they are released, forfeited, unripe, precluded by *res judicata*, proceeding without the proper parties, and exceeding the bounds of OAG's *parens patriae* authority.

Recognizing the necessity of an expedient resolution given the impending June 30, 2019 termination date, the Commonwealth Court severed Count I from the remainder of OAG's Petition. *See* Cmwlth. Ct. Scheduling Order II, 3/12/2019. Counts II-IV remain before the Commonwealth Court, and are not at issue in this appeal.

On April 3, 2019, the Commonwealth Court ruled upon UPMC's preliminary objections to Count I via a thorough single-judge memorandum and order. *Commonwealth by Shapiro v. UPMC*, 334 M.D. 2014 (Pa. Cmwlth. Apr. 3, 2019)

---

[7]    Highmark's Response to the Petition of the Commonwealth of Pennsylvania Office of the Attorney General to Modify Consent Decrees, 2/21/2019, at ¶¶ 17, 71-84.

[8]    UPMC's Answer, in the nature of a Motion to Dismiss or Preliminary Objections, 2/21/2019, at ¶ 12.

[9]    Memorandum in support of Respondent UPMC's Motion to Dismiss the Petition to Modify Consent Decrees, or Preliminary Objections in the nature of a Demurrer, 2/21/2019, at 18.

("Cmwlth. Ct. Op."). The court correctly noted that, in ruling upon preliminary objections, a court must accept as true all well-pleaded allegations of material fact and all reasonable inferences deducible from those facts, that any doubt must be resolved in favor of the non-moving party, and that "the question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Id.* at 24 n.9 (citing *Tucker v. Phila. Daily News*, 848 A.2d 113 (Pa. 2004)).

The Commonwealth Court considered and rejected each of UPMC's objections as applied to the relief sought in Count I. In the portion of the court's analysis at issue in this appeal, the court addressed UPMC's contention that OAG's proposed modifications are impermissible under the Modification Provision. The court overruled UPMC's demurrer with respect to the vast majority of the OAG's requested relief, observing that the Modification Provision authorizes OAG to petition the Commonwealth Court for modifications alleged to be in the public interest, and that OAG had followed that procedure. "Because the Consent Decree sets forth no other constraints on OAG's ability to seek modification," the Commonwealth Court "decline[d] to state with certainty that, at this stage of the proceeding, all the requested modifications are impermissible." *Id.* at 34. Further, the court reasoned, OAG's Petition "sufficiently avers that the requested modifications are in the public interest so as to advance most of the matter beyond the pleading stage." *Id.* (citing Petition at ¶ 73(a)-(d)). Moreover, rejecting UPMC's invocation of *Shapiro I* and the "law of the case" doctrine,[10] the Commonwealth Court noted that this Court's decision in *Shapiro I* "did not preclude the filing of a petition to

---

[10]     *See generally Commonwealth v. Star*, 665 A.2d 1326, 1331 (Pa. 1995) (law of the case doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter").

modify the Consent Decree prior to its expiration date," and accordingly ruled that *Shapiro I* "does not definitively bar the Petition at this stage." *Id.*

Notwithstanding this observation, the Commonwealth Court concluded that *Shapiro I* foreclosed one of OAG's proposed modifications—its request for "indefinite" extension of the Consent Decrees. The court reasoned:

> Nevertheless, there is one prayer for modification in Count I that cannot be granted by this Court: the prayer that the Court extend the duration of a modified Consent Decree indefinitely. As noted above, our Supreme Court has already decided that the June 30, 2019 termination date is an unambiguous and material term of the Consent Decree. That Court also instructed that in the absence of fraud, accident or mistake, courts have neither the power nor the authority to modify or vary the terms set forth. Whatever preclusion label is applied, our Supreme Court's ruling on this issue is binding here. Stated differently, regardless of the authority of the [OAG] or the remedies set forth in the Consent Decree, inherent limitations on this Court's power prevent relief inconsistent with the Supreme Court's prior ruling in this case. Because the OAG does not plead fraud, accident or mistake, this Court lacks the power or authority to modify the termination date of the Consent Decree without the consent of the parties, even if it were in the public interest to do so.

*Id.* at 34-35 (citations omitted).

Accordingly, the Commonwealth Court granted in part and denied in part UPMC's preliminary objections to Count I. Specifically, the court sustained UPMC's preliminary objections "only as to the prayer to extend modified Consent Decrees indefinitely," and overruled all other aspects of UPMC's preliminary objections to Count I. Order, 4/3/2019, at 1. The Commonwealth Court granted permission for an interlocutory appeal, opining that its order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the matter. *Id.* at 1-2; *see* 42 Pa.C.S. § 702(b); Pa.R.A.P. 1131.

OAG accepted the Commonwealth Court's invitation for an immediate interlocutory appeal and filed a Petition for Permission to Appeal to this Court, which we granted. We

undertook the matter on an expedited basis, have received full briefing on the question before us, and heard oral argument on May 16, 2019. We exercise jurisdiction over this appeal pursuant to 42 Pa.C.S. § 723(a).

The order appealed is narrow, inasmuch as OAG is aggrieved by the disposition of only one of its eighteen prayers for relief in Count I. The sole question before this Court is whether the Commonwealth Court erred in sustaining UPMC's demurrer to OAG's request to extend the Consent Decrees indefinitely, thus concluding that such relief is unavailable as a matter of law. The dispute turns both upon the court's stated basis for this conclusion—that such relief is precluded by *Shapiro I*—and the parties' divergent understandings of the scope and extent of "modifications" permissible under the Modification Provision of their Consent Decrees.

## III. Arguments

Before this Court, OAG first argues that the Commonwealth Court erred in concluding that *Shapiro I* controls the question at bar and, in so doing, misapplied the applicable principles of contract law. Despite the "express" language of the Modification Provision that permits OAG to seek modifications, OAG argues, the Commonwealth Court determined that the duration of the Consent Decrees was not subject to change "not by a principle of contract interpretation," but solely due to this Court's decision in *Shapiro I*. Brief for Commonwealth at 20. OAG notes, however, that *Shapiro I* did not involve the Modification Provision; rather, that litigation concerned OAG's petition to enforce the Consent Decrees, not to modify them. *Id.* at 25-26.

With regard to the meaning of the Modification Provision, OAG recounts the precept that words in a contract are "to be construed in their natural, plain, and ordinary sense," and that courts may look to dictionary definitions to inform that determination. *Id.* at 21-22 (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108

(Pa. 1999)). OAG accordingly points to definitions of "modification" or "modify" as a "change to something; an alteration," and to "change in form or character; alter." *Id.* at 22 (quoting BLACK'S LAW DICTIONARY 1095 (9th ed. 2009); THE AMERICAN HERITAGE DICTIONARY 807 (2nd College Ed. 1991)). In light of these definitions, OAG argues that the "*raison d'être* of the Modification Provision, therefore, is to empower the Commonwealth Court to 'change' or 'alter' the Consent Decree in the public interest. Nothing in the Modification Provision limits what the Commonwealth Court may alter." *Id.*

Seeking to shed additional light upon the meaning of the term, OAG argues that the Modification Provision is a "natural extension" of the obligations of charitable, non-profit healthcare institutions to act in the public interest. *Id.* at 27. The fact that the sole limitation upon the Commonwealth Court's authority to order modification is a determination of the public interest, OAG contends, is consistent with "the common purpose of all parties to the Consent Decrees, including UPMC." *Id.* To that end, OAG contrasts several precedents addressing the obligations of healthcare institutions to operate for the benefit of the public with the harm that it alleges will befall the public should the Consent Decrees be allowed to expire. *Id.* at 28-30.

Finally, in recognition of the impending termination date, OAG observes that the Commonwealth Court will be unable to resolve all claims in its Petition prior to June 30, 2019. OAG accordingly requests an interim extension of the Consent Decrees pending the final disposition of this litigation. OAG suggests that this Court should take extraordinary jurisdiction over the matter or invoke our King's Bench authority and "direct that the deadline for expiration of the Consent Decrees be temporarily extended until the

courts have reached a final, unappealable decision" on the merits of OAG's Petition. *Id.* at 34; *see* 42 Pa.C.S. § 726; *In re Bruno*, 101 A.3d 635 (Pa. 2014).[11]

Highmark, although named as an appellee herein, filed a brief in support of OAG's position. Highmark emphasizes that unambiguous provisions in a contract are deemed conclusive of the parties' intent, and that the "Consent Decrees plainly and explicitly direct that modifications shown to be made in the public interest may be made without limitation." Brief for Highmark at 25. That same "plain language," Highmark contends, demonstrates that the parties' intent was to serve the public interest. *Id.* at 29.

Highmark faults the Commonwealth Court for imposing a "materiality" limitation upon the Modification Provision, observing that nothing therein precludes modification of "unambiguous" and "material" terms of the Consent Decrees, as this Court characterized the termination date in *Shapiro I*. *Id.* at 31-33. With further regard to *Shapiro I*, Highmark finds no relevance in the reference therein to the general precept that contracts may not be modified absent fraud, accident, or mistake, inasmuch as *Shapiro I* did not implicate the Consent Decrees' express Modification Provision. *Id.* at 33-39. On Highmark's account of *Shapiro I*, this Court merely determined whether the "runout" provision of the contracts at issue satisfied UPMC's obligations under the *existing* Consent Decrees. *Id.* at 41-42. Highmark accordingly contends that *Shapiro I* does not preclude OAG from invoking the Modification Provision to change that *status quo*.

UPMC counters that OAG's proposed use of the Modification Provision is contrary to the parties' intent, in that the intent of the Consent Decrees, UPMC contends, was to establish a five-year transition period for UPMC and Highmark to wind down their

---

[11] OAG's position is supported by *amici curiae* Members of the Democratic Caucuses of the Pennsylvania House of Representatives and the Senate of Pennsylvania. *Amici* reiterate OAG's argument that the Commonwealth Court's reliance upon *Shapiro I* was misplaced, stress that the Consent Decrees explicitly provide for modifications in the public interest, and contend that OAG's proposed modifications satisfy that standard.

contractual relationships, and thereby to minimize disturbance to the health care industry and to avoid sudden disruption of health care consumers' expectations. UPMC's central argument is that modification of the termination date would transform its Consent Decree into a "perpetual contract" against its will, and that such relief would "'modify' the agreement out of existence by taking away UPMC's bargain and converting the Consent Decree into a permanent injunction with vastly broader terms." Brief for UPMC at 25, 33. Although UPMC refers to *Shapiro I*'s description of the Consent Decree termination date as "unambiguous" and "material," Brief for UPMC at 19 (quoting *Shaprio I*, 188 A.3d at 1132), UPMC does not vigorously defend the Commonwealth Court's application of *Shapiro I*. Rather, UPMC argues that indefinite extension of the Consent Decrees is a remedy that exceeds the intended scope of the Modification Provision.

UPMC first challenges OAG's proposed definition of the word "modify" as "change" or "alter" without limitation. In UPMC's view, "modify" means "to make minor changes" or to change the agreement "slightly, [especially] to improve it or make it more acceptable or less extreme." *Id.* at 20 (quoting MERRIAM WEBSTER ONLINE; CAMBRIDGE DICTIONARY ONLINE). UPMC cites our Superior Court's statement in *Commonwealth v. DeFusco*, 549 A.2d 140, 144 (Pa. Super. 1988), that "modify" means "altering or changing in incidental or subordinate measures." Brief for UPMC at 20. The Supreme Court of the United States, UPMC observes, applied a similar definition of "modify" in *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218 (1994), construing the word as to "change moderately or in minor fashion." *See also* Brief for UPMC at 21 (quoting *MCI*, 512 U.S. at 225 (noting that "[v]irtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion" and referring to the Latin root "mod-" as used in the words "moderate," "modulate," "modest," and "modicum" that share a "connotation of increment or limitation")). Accordingly, UPMC advances an

interpretation of the Modification Provision that would allow for modest changes to the terms of the Consent Decrees, but not sweeping alterations of core, foundational terms such as the termination date.

UPMC identifies several principles of contract interpretation it finds favorable to its interpretation. Arguing that one term of a contract should not be read to annul another, *id.* at 23 (citing *Kane*, 129 A.3d at 463-64), UPMC observes that the provision of the Consent Decrees that retains the Commonwealth Court's jurisdiction provides that such jurisdiction exists only "[u]nless this Consent Decree is *terminated.*" *Id.* at 22 (emphasis in original). If "modification" could include elimination of the termination date, UPMC contends, then those words would be rendered meaningless. *Id.* (citing UPMC Consent Decree § IV(C)(11)).[12] UPMC next stresses that specific, negotiated terms control over general terms, *id.* at 24 (citing *Musko v. Musko*, 697 A.2d 255, 256 (Pa. 1997)), and it points to extrinsic evidence of the parties' negotiations in an attempt to establish that, although the termination date was specifically negotiated, the Modification Provision was a general term included amongst the Consent Decrees' "boilerplate." *Id.* at 25. UPMC notes that the terms of a contract must be construed against its drafter—here, UPMC asserts, OAG. *Id.* at 26 (citing *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006)). Further, UPMC endorses the Commonwealth Court's reliance upon the precept that the terms of a consent decree may not be modified absent fraud, accident, or mistake, *id.* at 33 (citing *Universal Builders Supply, Inc. v. Shaler Highlands*

---

[12]     Along these same lines, and in service of its overarching argument regarding the parties' intent to create a limited, transitional arrangement, UPMC cites other provisions of the Consent Decrees that refer to "expiration" or the "transition," as well as an "interpretive principle" set forth at the beginning of the Consent Decrees, which provides that the document "is not a contract extension and shall not be characterized as such." Brief for UPMC at 27-28 (quoting UPMC Consent Decree §§ IV(C)(1)(a)(iii); IV(B); I(A)).

*Corp.*, 175 A.2d 58, 61 (Pa. 1961)), and argues that this standard remains applicable despite the language of the Modification Provision.

## IV. Analysis

The standards governing our review are well-settled. On appeal, we "exercise *de novo* review of a lower tribunal's order sustaining preliminary objections in the nature of a demurrer." *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 434 (Pa. 2017). A demurrer "tests the legal sufficiency of the complaint." *Ins. Adjustment Bureau*, 905 A.2d at 468. "For the purpose of evaluating the legal sufficiency of the challenged pleading, the court must accept as true all well-pleaded, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts." *Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 101 (Pa. 2008).

The "question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 274 (Pa. 2005) (quoting *MacElree v. Phila. Newspapers, Inc.*, 674 A.2d 1050, 1056 (Pa. 1996)).

### (A)

To begin, we agree with OAG and Highmark that the Commonwealth Court erred in concluding that this case is controlled by *Shapiro I*. As discussed above, *Shapiro I* addressed only whether the "runout" provision of the MA Provider Agreements satisfied UPMC's obligation to be "in a contract" for the treatment of Highmark's MA subscribers at in-network rates for the first six months of 2019. *See supra* at 2-4; *Shapiro I*, 188 A.3d at 1124. The case arrived before us on OAG's petition to *enforce* the Consent Decrees, not to *modify* them. Accordingly, we expressed no opinion regarding the proper interpretation of the Modification Provision. Indeed, the Commonwealth Court correctly

recognized that *Shapiro I* "did not preclude the filing of a petition to modify the Consent Decree prior to its expiration date," and, thus, "does not definitively bar the Petition at this stage." Cmwlth. Ct. Op. at 34. For the same reason, *Shapiro I* does not foreclose the relief at issue in this appeal.

Moreover, as Highmark specifically argues, the instant appeal is not controlled by *Shapiro I*'s reference to the general principle of contract law that, "in the absence of fraud, accident or mistake, [courts have] neither the power nor the authority to modify or vary the terms set forth." *Shapiro I*, 188 A.3d at 1132 (quoting *Universal Builders Supply*, 175 A.2d at 61) (bracketed material in original). Although this is an uncontroversial proposition as stated, the relief that OAG seeks in this matter is premised upon an express contractual term that allows for modification. This also distinguishes the instant case from *Shapiro I*.

Accordingly, the Commonwealth Court erred in sustaining UPMC's demurrer to the extent that it deemed the matter controlled by *Shapiro I*.

**(B)**

This conclusion, however, does not resolve our inquiry. UPMC demurred to OAG's request for indefinite extension of the Consent Decrees upon the basis that the Modification Provision does not permit such relief. This is a matter of contract interpretation. We reiterate the general contract principles that guide this analysis, as this Court set forth in *Kane*:

> [A] consent decree is a contract which has been given judicial sanction, and, as such, it must be interpreted in accordance with the general principles governing the interpretation of all contracts. *Int'l Org. Master, Mates & Pilots of Am., Local No. 2 v. Int'l Org. Masters, Mates & Pilots of Am., Inc.*, 439 A.2d 621, 624-25 (Pa. 1981). In interpreting the terms of a contract, the cardinal rule followed by courts is to ascertain the intent of the contracting parties. *Lesko v. Frankford Hosp.-Bucks Cty.*, 15 A.3d 337, 342 (Pa. 2011). If the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. *Kripp v. Kripp*, 849 A.2d 1159, 1162 (Pa. 2004). If, however, the contractual terms are ambiguous, then resort to extrinsic evidence to ascertain their meaning

is proper. *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). A contract's terms are considered ambiguous "'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" *Id.* at 430.

*Kane*, 129 A.3d at 463 (citations modified).

We must remain cognizant, however, that this matter arrives before us on preliminary objections, and our standard for assessing a demurrer also applies. Our decision in *Insurance Adjustment Bureau*, *supra*, is instructive in this regard:

> When, as here, a defendant demurs to a complaint and challenges a plaintiff's right to recovery on the grounds that the contract upon which plaintiff's claims depend does not mean what the complaint alleges, we look to see whether the contract's meaning, as is set forth in the complaint, is warranted under contract principles. *See Greek Catholic Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435, 438 (Pa. 1940). . . . When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982); *In re Herr's Estate*, 161 A.2d 32, 34 (Pa. 1960). A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Kripp*, 849 A.2d at 1163. *While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact. Id.*

*Ins. Adjustment Bureau*, 905 A.2d at 468-69 (emphasis added; citations modified). In *Insurance Adjustment Bureau*, we concluded that the contractual provision before the Court was susceptible of two reasonable constructions, that it thus was not amenable to conclusive interpretation on preliminary objections, and that the demurrer therefore must have been overruled. *Id.* at 482-83. Likewise here, the instant matter is at the pleading stage, and UPMC's demurrer may be sustained only if it is clear as a matter of law that OAG's requested relief is impermissible under the Modification Provision—that the

provision unambiguously establishes with "certainty that no recovery is possible." *Bilt-Rite*, 866 A.2d at 274.

We conclude that OAG and Highmark have set forth a plausible construction of the Modification Provision. As the parties note, the Modification Provision provides, in relevant part, simply that, "[i]f the parties cannot agree on a modification, the party seeking modification may petition the Court for modification and shall bear the burden of persuasion that the requested modification is in the public interest." *See supra* at 4. On its face, then, the Modification Provision reveals no textual limitation upon the type, number, or scope of permissible modifications.

The Commonwealth Court correctly observed that, aside from the necessity of averments relating to the public interest, "the Consent Decree sets forth no other constraints on OAG's ability to seek modification," and accordingly declined "to state with certainty that, at this stage of the proceeding, all the requested modifications are impermissible." Cmwlth. Ct. Op. at 34. However, because the Modification Provision admits of no exceptions on its face, the same reasoning must apply to OAG's request for extension of the Consent Decrees. That is, for the same reason that the Commonwealth Court reasoned that the other seventeen proposed modifications requested in Count I do not lie outside the bounds of the Modification Provision as a matter of law, modification of the duration of the Consent Decrees similarly is not precluded expressly by the language thereof.

Supporting OAG's and Highmark's interpretation is the fact that the parties to the Consent Decrees are sophisticated and that their interests were advanced and defended by skilled attorneys. Given the unbounded language of the Modification Provision, seasoned counsel likely foresaw, or should have foreseen, the possibility that significant alterations might be requested. Yet, the parties agreed to the Consent Decrees in full,

including the Modification Provision, which, it bears noting, appears in the paragraph immediately following the termination provision.

However, UPMC persuasively demonstrates that the meaning of the Modification Provision may be more elusive than its unqualified terms might suggest. UPMC is correct that dictionary definitions of the words "modification" and "modify" are replete with references to minor, slight, or partial changes, rather than sweeping changes unbridled in scope. *See, e.g.*, *Modification*, THE COMPACT OXFORD ENGLISH DICTIONARY 1101 (2d ed. 1991) ("The action of making changes in an object without altering its essential nature or character; . . . partial alteration."); *Modify*, THE COMPACT OXFORD ENGLISH DICTIONARY 1101 (2d ed. 1991) ("To make partial changes in; to change (an object) in respect of some of its qualities; to alter or vary without radical transformation."); *Modify*, BLACK'S LAW DICTIONARY 1157 (10th ed. 2014) ("1. To make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness . . . 2. To make more moderate or less sweeping; to reduce in degree or extent; to limit, qualify, or moderate"). Further, as UPMC highlights, the Supreme Court of the United States has interpreted the word "modify" along these lines, noting that "[v]irtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." *MCI Telecomms. Corp.*, 512 U.S. at 225; *see* Brief for UPMC at 20-21.

UPMC's interpretation is buttressed by its observation that other provisions of the Consent Decrees refer to their expiration, termination, or to their transitional nature. *See* Brief for UPMC at 22, 27-28 (citing UPMC Consent Decree §§ IV(C)(11); IV(C)(1)(a)(iii); IV(B)). Of course, such terms, like the termination date itself, also are not exempted expressly from the reach of the Modification Provision. However, as the "entire contract should be read as a whole," our interpretation must seek to "give effect to all of its provisions," and we "will not interpret one provision of a contract in a manner which results

in another portion being annulled." *Kane*, 129 A.3d at 463-64 (quoting *Pritchard v. Wick*, 178 A.2d 725, 727 (Pa. 1962); *Murphy*, 777 A.2d at 429; *LJL Transp. v. Pilot Air Freight*, 962 A.2d 639, 648 (Pa. 2009)).  At a minimum, UPMC establishes a degree of tension within the four corners of the Consent Decrees that casts doubt upon OAG's and Highmark's argument that unrestricted modification of the duration of the Consent Decrees comports with the parties' intent.

In sum, we are presented with two constructions of the Modification Provision.  On OAG's and Highmark's accounts, because the provision sets no limits upon the modifications contemplated, such modifications may extend to any term of the Consent Decrees, including the termination date.  Brief for OAG at 22; Brief for Highmark at 31. On UPMC's account, especially in light of the shades of meaning encompassed within the word "modify," the Modification Provision may be employed for minor alterations to the terms of the Consent Decrees, but may not "repudiate fundamental terms of the parties' agreement" such as the termination date.  Brief for UPMC at 23.

As applied to this circumstance, we find that the Modification Provision is "subject to more than one reasonable interpretation."  *Kane*, 129 A.3d at 463 (quoting *Murphy*, 777 A.2d at 430).  That is, the provision is ambiguous with respect to the availability of the relief that OAG seeks.  Where contractual terms are ambiguous, "resort to extrinsic evidence to ascertain their meaning is proper."  *Id.*; *see also Ins. Adjustment Bureau*, 905 A.2d at 468.  Consequently, interpretation of the contested provision is a matter for the fact-finder based upon its assessment of extrinsic evidence of the parties' intent.  This is a fact question not suitable for resolution on preliminary objections to a pleading, which may be sustained only when the requested relief is clearly unavailable as a matter of law. *Ins. Adjustment Bureau*, 905 A.2d at 469 ("While unambiguous contracts are interpreted

by the court as a matter of law, ambiguous writings are interpreted by the finder of fact."); *see also Kripp*, 849 A.2d at 1163.

Notably, and by way of illustration, this Court in *Kane* concluded that the term "Medicare participating consumers" as used in the Consent Decrees was ambiguous. *Kane*, 129 A.3d at 463. To resolve that ambiguity, we held, the Commonwealth Court "properly resorted to the consideration of extrinsic evidence on this question, which was furnished through the testimony taken at the hearing held in this matter, and the exhibits submitted by the Commonwealth from the federal government's Medicare website." *Id.* at 466. This stands in contrast to the instant case, in which the lower court has yet to weigh any evidence regarding the intended meaning and scope of the Modification Provision.

Although UPMC successfully establishes that OAG's interpretation is not conclusive with regard to the relief that OAG requested, it does not persuade us that the Modification Provision is susceptible *only* to UPMC's interpretation, as would be necessary for us to determine that "the law says with certainty that no recovery is possible." *Bilt-Rite*, 866 A.2d at 274. Accordingly, and because we must resolve all doubt in favor of overruling UPMC's demurrer, *id.*, we cannot conclude that OAG's requested relief is unavailable as a matter of law. Rather, the matter requires evidentiary development beyond the pleading stage in order to glean what the text fails to reveal: the parties' intent with regard to the scope of the Modification Provision. *See Ins. Adjustment Bureau*, *supra*.

**(C)**

At this juncture, we do not deem it necessary to extend the termination date of the Consent Decrees through the extraordinary powers that OAG asks us to invoke. Although the presently applicable termination date is near, the dispositive legal question is narrow,

and the evidentiary record that is necessary to resolve that question accordingly will be limited. We are confident that the skilled advocates before us will be able to marshal adequate extrinsic evidence of the parties' intent expeditiously, and to promptly build a narrowly focused record sufficient for the fact-finder to interpret the contested provision based upon that evidence in the first instance. The Commonwealth Court is expressly authorized to conduct a hearing on the matter. Because it is dispositive of much of the litigation, we direct the court on remand to prioritize, as it did below, the question of extension of the Consent Decrees, and we concomitantly order the parties to refrain from offering evidence or arguments that stray into other disputed issues.[13]

The order of the Commonwealth Court is reversed, and the matter is remanded for further proceedings consistent with this Opinion.

Justices Todd, Dougherty and Mundy join the opinion.

Justice Baer files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Donohue join.

---

[13] In this regard, we stress that our ruling is not intended to foreclose the ability of the Commonwealth Court to take such steps as it deems necessary and within its authority to allow for a full and fair resolution of the instant question.