# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Myco Mechanical, Inc.,                                :
                    Appellant        :
                                     :
                                     :   No. 590 C.D. 2021
         v.                           :   SUBMITTED: June 3, 2022
                                       :
The City of York                                         :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                 **FILED:  October 12, 2022**


Myco Mechanical, Inc. appeals from an order of the Court of Common Pleas of York County granting the City of York's motion for summary judgment in its entirety.  We affirm.

This matter originated with the conversion of the City's Old City Hall at 50 West King Street, York, Pennsylvania, into headquarters for the City's police department.  A heating ventilation and air conditioning (HVAC) contractor, Myco entered into a 2012 contract with the City for $1,043,000.  (Dec. 5, 2014 Compl., ¶ 5.)  In order to coordinate the work and enable the various trades to work efficiently, the City required Myco and the other prime contractors to agree to perform their respective work within the time frames provided in the project schedule incorporated into the bid documents.  (*Id*., ¶¶ 6 and 7.)  Myco's work was dependent upon the other trades' timely completion of work as set forth in that schedule.  (*Id*., ¶ 13.)

In November 2012, the City issued Myco a notice to proceed triggering the start of the 400-day duration of Myco's work. (*Id*., ¶ 10.) Myco mobilized for work with a start date in late November 2012 but had to demobilize when predecessor work was incomplete. (*Id*., ¶¶ 14 and 15.) Myco remobilized and commenced work in January 2013. (*Id*., ¶ 16.) Ultimately, the City extended the project schedule to reflect an August 2014 completion date for Myco's work. (*Id*., ¶ 11.) The delay from the originally scheduled completion date in December 2013 to the actual completion date in August 2014 resulted in an additional 129 days for Myco. (*Id*., ¶ 20.) Myco averred that the delay was caused by the City's failure to timely coordinate the other prime contractors and to complete the necessary precursor work. (*Id*., ¶¶ 21 and 22.) In addition, Myco alleged that the City delayed the project by failing to have the site available for work at the initial stages and at various times throughout, thereby preventing Myco from completing its work. (*Id*., ¶ 24.) Myco alleged: "As a direct and proximate result of the construction delays caused by [the City], Myco [] incurred additional costs to complete its work on the [p]roject beyond those originally contemplated by its contract . . . ." (*Id*., ¶ 25.)

In December 2014, Myco commenced a civil action against the City seeking $258,200.36 in direct damages, plus interest, penalties, and counsel fees. The complaint included four counts: (1) breach of contract (City unilaterally modified and extended time for completion of Myco's work on the project); (2) unjust enrichment (in the alternative); (3) breach of implied contract (in the alternative); and (4) a claim under what is commonly called the Prompt Pay Act.[1] In February 2015, the City filed an answer and new matter therein asserting a

---

[1] Sections 3931 through 3939 of the Commonwealth Procurement Code, 62 Pa.C.S. §§ 3931-3939, are frequently referred to as the Prompt Pay Act.

counterclaim. Following extensive discovery, the City filed the September 2020 motion for summary judgment on liability that is presently at issue. The trial court granted the City's motion in its entirety and Myco's appeal to this Court followed.[2]

The success of Myco's case depends upon the applicability of the exculpatory "no damages for delay" clause found in the parties' contract, which provides for an extension of time but not monetary consideration in the case of delay. The clause, which the City maintains constitutes Myco's sole remedy for a delay claim, states:

> **§ 8.3.3 Delays and Extensions of Time**. No payment or compensation or claim for damages shall be made to the Contractor as compensation for damages for any delays or hindrances from any cause whatsoever in the progress of the Work, notwithstanding whether such delays be avoidable or unavoidable. The Contractor's sole remedy for delays shall be an EXTENSION OF TIME ONLY, pursuant to and only in accordance with this Paragraph 8.3; such extension to be a period equivalent to the time lost by reason of any and all of the aforesaid causes, as determined by the Architect. In consideration for this grant of a time extension, neither the Owner or Architect shall be held responsible for any loss or damage or increased costs sustained by the Contractor through any delays caused by the Owner or Architect, or any other Contractor, or on account of the aforesaid causes or any other cause of delay. In the event the Contractor shall choose to litigate this clause or issue and loses said

---

[2] The entry of summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Marks v. Tasman*, 589 A.2d 205, 206 (Pa. 1991). The record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Our review of an order granting summary judgment involves only an issue of law. Hence, our review is plenary. *Bourgeois v. Snow Time, Inc.*, 242 A.3d 637 (Pa. 2020).

3

litigation, the Contractor shall reimburse the Owner and the Architect for their reasonable attorney's and expert witness fees and all other costs and expenses incurred by them in the litigation.

(City's Mot. for Summ. J., ¶ 8; Reproduced Record "R.R." at 54a.)

Exculpatory provisions such as "no damages for delay" clauses are disfavored under the law. *Vinikoor v. Pedal Pa., Inc.*, 974 A.2d 1233, 1238 (Pa. Cmwlth. 2009). Nonetheless, they are generally enforceable but "cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act on some essential matter necessary to the prosecution of the work." *Guy M. Cooper, Inc. v. E. Penn Sch. Dist.*, 903 A.2d 608, 613 (Pa. Cmwlth. 2006).

Courts have found sufficient affirmative or positive interference to overcome the applicability of the "no damages for delay clause" where the owner but not the contractor was aware of pre-bidding problems with availability, access, or design. *Id*. at 613-14. For example, in *Coatesville Contractors & Engineers, Inc. v. Borough of Ridley Park*, 506 A.2d 862 (Pa. 1986), the owner knew of a preexisting access problem caused by an undrained lake. In *Department of Highways v. S.J. Groves & Sons Co.*, 343 A.2d 72 (Pa. Cmwlth. 1975), the owner knew that a contractor would not have access to a portion of the construction site for a fourteen-week period while a utility removed and replaced cable conduits.

Likewise, "an owner cannot insulate itself from a delay damage claim where it fails to perform an essential contractual duty." *Guy M. Cooper*, 903 A.2d at 614. Where an owner responsible for contractor cooperation directed a contractor to proceed but the contractor was prevented from accessing the work area for five months due to another contractor, the Supreme Court found that the owner had failed to perform an essential duty. *Gasparini Excavating Co. v. Pa. Tpk. Comm'n*, 187

4

A.2d 157 (Pa. 1963). Another such example occurred when an owner that assumed responsibility for negotiating the relocation of a water line failed to do so expeditiously thereby precluding access while others relocated the water line. *State Highway & Bridge Auth. (Penn-DOT) v. Gen. Asphalt Paving Co.*, 405 A.2d 1138 (Pa. Cmwlth. 1979).

Here, Myco asserted four sources of delay that allegedly established active interference or neglect on the City's part sufficient to overcome the enforceability of the "no damages for delay" clause: discovery of additional asbestos requiring remediation; discovery of lead-based paint requiring abatement; delivery delay of air handling and condenser units by Johnson Controls; and Verizon's delay in performing information technology "IT" work. Myco's first argument, that material facts remained disputed, somewhat overlaps its second argument, that certain periods of delay should be attributable to the City and constitute a defense to the "no damages for delay" clause. We elaborate on the alleged sources of delay where warranted.

## I.

Myco first argues that the trial court erred in granting the motion for summary judgment where material facts remain disputed, especially those that Myco raised in its response to the motion via the expert report from Damian Cassin of Progressive Construction Management (PCM Report).[3] (June 16, 2017 PCM Report

---

[3] Pursuant to Pennsylvania Rule of Civil Procedure 1035.3, it was Myco's burden to produce facts arising from the summary judgment record to contradict the City's motion for summary judgment. Contrary to the City's suggestion, expert reports are among the documents that a court may consider as part of a motion for summary judgment. In fact, "the summary judgment standard requires a trial court to view the non-moving party's expert reports, and all reasonable inferences, in a light most favorable to the non-moving party, and the trial court cannot '*sua sponte* assail them' if their conclusions are 'sufficiently supported[.]'" *Bourgeois*, 242 A.3d at 652 (citation omitted).

at 1-32; R.R. at 770a-801a.)  In support, Myco cites six conclusions from the PCM Report:

> 1. "[A]s noted in this report, the presence of abatement impacted not only initial demolition and subsequent progress, but regularly resulted in interference with access."  R.R. [at] 777a.

> 2. [I]nability to proceed with employee relocation due to the lack of an IT prime contract delayed the "critical activity of Stair 2 Demolition on the third floor" for 39 days.  R.R. [at] 777a.

> 3. [A]batement work was required[.] "[P]redecessor activity required before demolition could proceed."

> 4. "[L]imited work had proceeded on the project due to delays in relocation and on-going abatement."  R.R. [at] 781a.

> 5. "[T]he Engineer requiring performance specifications which his own basis of design equipment manufacturer apparently could not provide" caused a three-month delay[.]  R.R. [at] 783a.

> 6. "[T]he IT feed, and subsequent interior main service feed and system programming, installed by Verizon will comprise the single largest delay to the project."  R.R. [at] 776a.

(Myco's Br. at 17-18.)

The first, third, and fourth conclusions from the PCM Report are interrelated.  Turning to the first conclusion, there is no dispute that abatement impacted the initial demolition and subsequent progress, as well as interference with access.  As for the third conclusion, there is no dispute that abatement was required before demolition could proceed.  Turning to the fourth conclusion, that only limited work on the project had proceeded due to delays in relocation and continuing

6

abatement, there similarly is no dispute that there was delay and that work could not always proceed.

The second and sixth conclusions are also interrelated. The second conclusion provides that the inability to proceed with employee relocation due to the lack of an IT prime contract delayed the Stair 2 Demolition on the third floor for thirty-nine days. The sixth conclusion states that "the IT feed, and subsequent interior main service feed and system programming, installed by Verizon will comprise the single largest delay to the project." (R.R. at 776a.) However, the fact that there were delays attributable to IT-related issues is not in dispute. The IT contractor whose job it was to get the project ready for the utility networks, Computer Support Services, Inc. (CSSI), was the entity that caused unanticipated delay. As the summary judgment record reflects, this issue was communicated to the bidders and incorporated into the contract. In addition, the contractors were continuously updated. (*See* City's Mot. For Summ. J., Ex. 101, "Project Manual, Addendum No. 2 Bid Form"; Ex. 102, "Re-bid Addendum A"; Ex. 103, "Re-Bid Addendum C"; Ex. 104, "Re-Bid Addendum E"; and Ex. 105, "Re-Bid Addendum F"; R.R. at 621a-33a.) As for Verizon, the City gave Myco the notice to proceed in November 2012 and the contract with Verizon did not start until June 2013, well after the project started. (May 7, 2021 Trial Ct. Op. at 30.) In addition, Myco failed to provide a document identifying IT problems with Verizon or any other entity between November 20, 2012 and January 7, 2013.

The fifth conclusion, which pertains to the City's contract with Johnson Controls to provide two air handling units and one condensing unit, states that there was a three-month delay as a result of "the Engineer [Uday Patel, architect Buchart Horn's employee] requiring performance specifications which his own basis of

7

design equipment manufacturer apparently could not provide[.]" (R.R. at 783a.) However, the summary judgment record does not reflect undisputed material facts pertaining to Johnson Controls. In determining that Myco failed to establish active interference or neglect on the City's part, the trial court emphasized the timeline of when Myco alleged the delay occurred, when the design specifications for these units were resolved, and when the units were shipped. Myco alleged delay for the period of January 2014 to March 2014. However, all three units had shipped by July 2013. In addition, in many instances Uday Patel reviewed the specifications in a shorter period of time than that required under the contract. (May 7, 2021 Trial Ct. Op. at 29.) Consequently, "the design specifications for all three units were resolved, and all three units had been shipped, well before the period of time in which Myco alleges a delay occurred." (*Id*.)

Moreover, the trial court noted Myco's seeming acknowledgment that it was paid the entire amount to which it was entitled. In support, the trial court cited Myco's answer to interrogatory No. 24 of the City's second set of interrogatories:

> **Interrogatory No. 24**.
> Are you contending that you performed additional work in the project—beyond what you bid for the work—that you have not been paid for? If so, identify all such additional unpaid work.
>
> **Answer**:
> No.

(May 7, 2021 Trial Ct. Op. at 4.)

Accordingly, the six assertions from the PCM Report do not indicate that there are genuine issues of material fact that directly contradict the facts that the

8

trial court found dispositive regarding the City's actions pertaining to the periods of delay.

## II.

Myco next argues that the City's actions constituted active interference or neglect sufficient to overcome any defense involving the "no damages for delay clause" and, therefore, should have precluded the trial court's entry of summary judgment. To that end, Myco asserts that the delays in the project were caused by the City's failure to have the proposed site available for work at the start of the project and at various times throughout thereby preventing Myco from performing and completing its work in a timely and orderly fashion. As noted, the four alleged sources of delay arguably attributable to the City are as follows: discovery of additional asbestos requiring remediation; discovery of lead-based paint requiring abatement; delivery delay of air handling and condenser units by Johnson Controls; and Verizon's delay in performing IT work. In addition, Myco contends that the City waived any defense related to the "no damages for delay" clause by processing, approving, and paying some delay claims during the course of the project.

In determining that Myco failed to sufficiently demonstrate either active interference or neglect on the City's part, the trial court copiously considered the four alleged sources of delay. Turning first to asbestos, the trial court concluded that there was no evidence in the summary judgment record upon which a reasonable inference could be made that the City was hiding information from Myco or had not disclosed information regarding asbestos-containing materials. To the contrary, the trial court found that the City advised Myco that asbestos existed at the site and that more could be discovered once the renovation and demolition commenced. In addition, the trial court noted that an asbestos survey was included in the bid

9

specifications explaining that, even though a thorough inspection had been conducted, more asbestos-containing materials could be found in a structure of the general age and size of Old City Hall. (May 7, 2021 Trial Ct. Op. at 25.) As the trial court concluded: "While the . . . record certainly reflects that there were issues with additional asbestos being discovered throughout the [p]roject—and specifically, when demolition and construction commenced . . . we find that Myco has not demonstrated that the delay, which resulted from those issues, was due to or caused by any active interference or neglect on the part of the City." (*Id*. at 26.)

Turning to lead-based paint, the trial court similarly rejected Myco's contention that the City failed to recognize the presence of lead or the necessity for remediation before commencing work. Noting Myco's alleged period of delay attributable to lead (November 20, 2012 to January 7, 2013),[4] the trial court found that the record revealed that lead was not discovered until February 26, 2013, well after Myco's alleged period of delay. In addition, the record reflected that once the general contractor requested information regarding lead, the issue was promptly addressed. (*Id*. at 28.)

As for Myco's contention that the City knew about the lead-based paint when the contracts were bid, Myco cites the deposition testimony of David Rudolph, the City's superintendent of the electrical bureau and building maintenance. Rudolph testified that lead abatement work was originally to be performed when the contracts were bid. (Apr. 27, 2016 Dep. of David Rudolph, Notes of Test. "N.T." at 28-29; R.R. at 881a-82a.) In addition, he stated that lead abatement work added only a week to the project schedule and that it was not a big issue. To that end, he testified that the same company simultaneously did lead and asbestos abatement at the time

---

[4] (Myco's Oct. 16, 2019 Am. Resps. & Objs. to the City's Fourth Set of Interrogs., ¶ 4(3); R.R. at 595a.)

10

of remediation. (N.T. at 29-30; R.R. at 882a.) While it is true that he later provided a supplemental affidavit stating that he was mistaken in answering that he was aware of lead paint in the building before the bid process, he reiterated that lead abatement was not a big issue and did not interfere with Myco's work. (Jan. 12, 2021 Rudolph Aff. at 1-2; Suppl. R.R. "S.R.R." at 8b-9b.)

As for the Johnson Controls delay issue, our determination in Section I of this opinion—that there were no undisputed material facts with regard to this particular delay—applies here. Accordingly, we agree with the trial court that this delay did not constitute active interference or neglect on the part of the City sufficient to overcome the applicability of the "no damages for delay" clause.

Turning to the delay attributed to Verizon, Myco asserts that the City's knowledge of a contract dispute with Verizon before the project started and failure to communicate that fact to the bidders constituted active interference sufficient to preclude the applicability of the "no damages for delay" clause. In rejecting Myco's assertion, we refer to our determination in Section I concluding that Myco failed to establish that any issues with Verizon constituted genuine issues of material fact that directly contradicted the facts that the trial court found to be dispositive. Accordingly, we agree with the trial court that Myco failed to establish active interference on the City's part with respect to any delays related to Verizon.

As for the City's alleged waiver of the defense pertaining to the "no damages for delay" clause, the City acknowledges that it paid out monies to certain contractors due to unforeseen difficulties. (City's Br. at 17.) However, the City made the payments pursuant to a "concealed or unknown conditions" clause providing:

> **§ 3.7.4 Concealed or Unknown Conditions**. If the Contractor encounters conditions at the site that are (1)

11

concealed physical conditions that differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, the Contractor shall promptly provide notice to the Owner and the Architect before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if the Architect determines that they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall promptly notify the Owner and Contractor in writing, stating the reasons. If either party disputes the Architect's determination or recommendation, that party may proceed as provided in Article 15.

(Contract, ¶ 3.7.4; R.R. at 858a-59a.)

The City's payment pursuant to a "concealed or unknown conditions" clause does not preclude the applicability of the "no damages for delay" clause. In other words, the employment of one clause does not necessarily preclude the applicability or constitute waiver of another clause. Notably, the two contractual provisions pertain to different subjects and project delays may or may not be attributable to concealed or unknown conditions. In addition, the entire contract should be read as a whole, an interpretation must seek to give effect to all of its provisions, and one provision should not be interpreted in a manner which results in another portion being annulled. *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 911 (Pa. 2019). As the trial court concluded, the issue before it was whether

12

the "no damages for delay clause" was a valid exculpatory provision and whether Myco established an exception to overcoming the clause's enforceability. (May 7, 2021 Trial Ct. Op. at 24; R.R. at 936a.)

## III.

Finally, Myco maintains that the trial court erred in concluding that the City met its burden of proving that the exculpatory provision was valid and enforceable. As stated, these clauses are generally enforceable as long as the recognized exceptions do not apply. Upon review of the summary judgment record, we agree with the trial court that Myco failed to come forward with evidence sufficient to contradict the City's summary judgment motion. Accordingly, we affirm.

 

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

Judge Fizzano Cannon did not participate in the decision for this case.

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Myco Mechanical, Inc.,          :
            Appellant      :
                       :    No. 590 C.D. 2021
         v.               :
                       :
The City of York           :

# O R D E R

AND NOW, this 12th day of October, 2022, the order of the Court of Common Pleas of York County is hereby AFFIRMED.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita