J-S37016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL CALISTO, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL RODGERS | : | No. 2834 EDA 2018 |

Appeal from the Judgment Entered, November 2, 2018,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s):  160801903.

BEFORE:  BOWES, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                          Filed: August 6, 2020

## I.     Introduction

In this quiet title action involving the ownership of three townhouses in Philadelphia, the Plaintiff, Michael Calisto, appeals from the judgment entered in favor of the Defendant, Michael Rodgers, following a non-jury trial.  Upon review, we conclude that, under the statute of frauds and the parol-evidence rule, the trial court improperly denied Calisto relief.  We vacate the judgment and remand for entry of a proper, equitable decree, granting Calisto quiet title to the townhouses but requiring him to return the purchase money to Rodgers.

## II.     Factual & Procedural Background

Michael Calisto inherited three townhouses when his mother, Joan Calisto, passed away in 2001.  A dispute between Calisto and Rodgers began 15 years later, in 2016, and resulted in this litigation.   As the record indicates,

the parties have drastically different stories regarding their claims of ownership to the properties.

Calisto claims that, in July of 2016, he awoke to find a locksmith attempting to remove the lock from the front door of one of the townhouses. When Calisto asked the locksmith what he was doing, he said that Rodgers' realty company sent him to change the locks. He pointed down at Rodgers, who was sitting in his car in front of Calisto's house. Calisto yelled that he was calling the police, and Rodgers sped away.

A few days later, Joshua Weidman knocked on Calisto's door asking to view the three properties. Weidman claimed he had equitable title to the townhouses under a written contract between him and Rodgers. A week before, Rodgers had contacted Weidman to see if his company, Turn Key Philly, LLC, was interested in flipping three properties that Rodgers just acquired. Weidman left Calisto his card and gave him a phone number for Rodgers.

Calisto soon instituted legal action by filing a writ of summons against Weidman and Turn Key Philly, LLC. On August 16, 2016, he also filed *lis pendens* notices for all three properties.

In a pre-complaint deposition, Weidman shared more details about his interaction with Rodgers. He said Rodgers claimed to have recently heard of the three properties from someone named "Ed" at a casino. Ed (last name unknown) told Rodgers he represented Joan Calisto, who wished to sell some

real estate. Weidman attempted to reach Ed at a phone number Rodgers provided, but the line was not in service.

After Weidman discovered Calisto was living in one of the homes, he searched online for Joan Calisto and realized she was deceased. He therefore concluded the underlying transfer was likely fraudulent (something Weidman said was common in the Philadelphia market) and abandoned hope of purchasing the properties from Rodgers. Weidman stopped returning any calls or texts from Rodgers. Based on this information, Calisto substituted Rodgers as the defendant and dismissed Weidman and his company from the lawsuit.

In his complaint, Calisto asserted that Rodgers recorded forged deeds to the three homes and attempted to steal his properties. Among the several counts in his complaint, Calisto brought an action for quiet title seeking declaratory judgment of ownership and specific performance to correct the official property records in Philadelphia County.

Rodgers presented a much different version of events. Rodgers testified that someone named "Eddy" had told him about Calisto's properties at a casino while they were playing blackjack together, in the summer 2016. He said that he followed up on that lead on July 13, 2016 by going to inspect the homes. Rodgers found them in utter disrepair, although they were structurally sound. In one of the properties, he met a man named John Callaway, who at first appeared to be a squatter, but turned out to be a tenant. After a brief discussion, Callaway acknowledged that he and Calisto had sent Eddy to find

potential buyers. Shortly thereafter, Calisto came to Callaway's apartment and confirmed that he was looking to sell.

Calisto told Rodgers that his mother, Joan, was dead and, through their family realty company, Calisto had authority to sell the homes. Rodgers returned to the residences on July 14, 2016 and the parties resumed negotiations. Calisto originally offered the homes for $250,000 to Rodgers. They settled on $150,000 in cash for all three.

Rodgers retuned on July 15, 2016 with a $10,000 down payment. Next, he and Calisto executed a written Sales Agreement in Joan Calisto's name, which Rodgers testified was a contract for the transfer of the three properties. Rodgers did not, however, know or ask whether an estate for Joan Calisto existed at that point. He testified that he was ignorant of the law of estates and land transactions.[1] The Sales Agreement, which Calisto admitted into evidence during his cross-examination of Rodgers, indicates that Joan Calisto and Rodgers executed it on July 7, 2016 – *i.e.*, a week **before** Rodgers' initial meeting with Calisto and fifteen years **after** Joan Calisto's death.

The Sales Agreement has the seal and signature of Celeste Cerino, a notary public. **See** Calisto's Exhibit - 4 at 3. According to Rodgers' testimony, the "X" typed next to the word "ACCEPTED" in the Sales Agreement was Rodgers' indication that he agreed to buy the properties, that Calisto initialed

---

[1] Of course, as we explain below, under the Supreme Court of Pennsylvania's explicit teachings in **Kurland v. Stolker**, 533 A.2d 1370, 1372 (Pa. 1987), ignorance of the law of property is no excuse for commencing a legally deficient land transaction.

it on behalf of his dead mother as "J.C.," and that an illegible signature above the words "Selling Company" was Calisto's signature on behalf of "Prime Real Estate, LLC." *See* N.T., 3/27/18, at 165. Rodgers further testified that Calisto assured him that "Prime Real Estate" was Calisto's family realty company and he could sell the homes in his corporate role. Nothing within the four-corners of the Sale Agreement reflects that such a representation occurred, however, nor does the contract itself evidence that Calisto, in fact, signed on behalf of the corporation. Indeed, Calisto's name does not appear anywhere in the Sales Agreement. We examine the Sales Agreement in detail below. *See* this Opinion *infra*, Section III, B-1.

Rodgers spent the next two weeks withdrawing the additional $140,000 to purchase the properties from his bank's ATMs and a local casino. Rodgers produced his bank statements evidencing these withdrawals, but no writing indicated that Calisto ever received those payments.

Instead, Rodgers testified that he paid cash to Calisto, who then gave him three deeds with the signatures of Joan Calisto, as the grantor. Absent from Rodgers' testimony, though, is any indication of how those deeds were notarized or any mention of a notary being present to authenticate the documents at the closing.

Someone dated the deeds for July 7, 2016, although Rodgers testified that this exchange occurred near the end of the month – around July 26, 2016. Rodgers testified that he then recorded the deeds as Calisto had instructed. However, when Rodgers sent a locksmith to take possession of the homes, he

learned that Calisto lived in one of the properties. To Rodgers' dismay, Calisto refused to surrender possession of the properties.

Rodgers sought help from the District Attorney of Philadelphia County, but the staff informed him that this was a civil (as opposed to a criminal) matter, so they did not have jurisdiction. Learning this, Rodgers initiated his own lawsuit against Calisto seeking quiet title to the same three properties. **See Rodgers v. Calisto**, No. 160901119 (C.C.P. Philadelphia 2016).[2] Rodgers eventually moved to consolidate that case with this one before trial, but the Court of Common Pleas of Philadelphia County, *per* the Honorable Denis P. Cohen, denied the motion without explanation. **Id.**, March 12, 2018 Order.

The instant case (**Calisto v. Rodgers**) proceeded to trial before the Honorable Karen Shreeves-Johns at the end of March 2018. The trial judge heard the conflicting stories from the parties. Rodgers also called Hattisha

---

[2] We take judicial notice of the trial court's record in **Rodgers v. Calisto**, No. 160901119 (C.C.P. Philadelphia 2019), which we discuss in detail below. **See** Pennsylvania Rule of Evidence 201. As a now-final judgment on the merits, it has legal force and effect under the doctrine of *res judicata*.

> "*Res judicata*" means 'a thing adjudged' or a matter settled by judgment. Traditionally, American courts have used the term *res judicata* to indicate claim preclusion, *i.e.*, the rule that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and constitutes for them an absolute bar to a subsequent action involving the same claim, demand or cause of action.

**Stoeckinger v. Presidential Fin. Corp. of Delaware Valley**, 948 A.2d 828, 832 (Pa. Super. 2008).

Rogers (no relation) to testify about what she witnessed regarding the parties' execution of their oral agreement. Hattisha rode with Rodgers to one of the properties on the day that Rodgers and Calisto consummated their transaction. According to Hattisha, she saw Rodgers give a bag full of large bills to Calisto and another tall man, on the sidewalk near one of the properties. Rodgers handed over the cash and returned to the car with a folder full of deeds and other papers.

Judge Shreeves-Johns found that Rodgers and Hattisha were "more credible than [Calisto] regarding the alleged fraudulent transaction for the deeds to the properties." Trial Court Opinion, 11/28/18, at 6-7. Based upon their testimony, the court determined that Rodgers "received the deeds from [Calisto] without reason to question the validity of the signatures, as they were received from [Calisto] as executor and beneficiary of his mother's estate." *Id.* at 11. The trial court therefore refused to quiet title for Calisto and returned a non-jury decision in favor of Rodgers.

Calisto filed post-trial motions, seeking judgment as a matter of law or, in the alternative, a new trial. As error, he claimed that the court refused to admit evidence of Rodgers' criminal conviction for crimes of falsehood and failed to give effect to the statute of frauds. The trial court denied those requests, and this timely appeal followed.

While this appeal was pending, the other lawsuit involving these parties and these properties, ***Rodgers v. Calisto***, went to trial on February 12, 2019. For reasons unclear on either record, the common pleas court assigned that

case to the Honorable Lillian H. Ransom, instead of the judge who had already tried and decided this matter. At the beginning of trial, Rodgers moved for judgment as a matter of law, because he believed that Judge Shreeves-Johns' decree in *Calisto v. Rodgers* was *res judicata* and barred recovery by Calisto. *Rodgers v. Calisto*, N.T., 2/12/19, at 8-12.[3] Judge Ransom denied that motion. *See id.* at 15.

_____

[3] Upon reviewing the parties' initial appellate briefs, we:

> observe[d] that [Calisto's] Brief at footnote 4 indicates that the Honorable Lillian H. Ransom rendered a non-jury decision in *Rodgers v. Calisto* (Court of Common of Philadelphia County Civil Docket No. 160901119) in favor of Calisto that may affect the disposition of this appeal. Thus, both parties [were] ORDERED to file supplemental briefs to explain what impact, if any, that now-final judgment has upon the instant appeal and why.

Superior Court Order, 9/3/19. Calisto and Rodgers complied with that order.

Calisto's Supplemental Brief includes a transcript from the trial in *Rodgers v. Calisto*. That transcript contains the certification of Kimberly A. Wilson, Court Reporter for the Court of Common Pleas of Philadelphia County. *See* N.T., 2/12/19, at 32. Moreover, Rodgers did not contest the authenticity or reliability of Reporter Wilson's transcript. In fact, Rodgers cites to and relies upon it, as well. *See* Rodger's Supplemental Brief at 2.

As mentioned above, we judicially notice *Rodgers v. Calisto* (Court of Common of Philadelphia County Civil Docket No. 160901119) under Rule of Evidence 201, and that case's record includes the certified transcript from Reporter Wilson. Under Rule 201, any court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b). We may take judicial notice *sua sponte* and for the first time on appeal. *See* Pa.R.E. 201(c),(d).

Due to that ruling, Rodgers found himself in a quandary. He tried to submit the recorded deeds, but the pages with Joan Calisto's signature were missing. Calisto objected to the admission of the deeds based upon the statute of frauds and moved for dismissal of Rodgers' action. ***See Id.*** at 26.

Counsel for Rodgers conceded he did not have full copies of the deeds. Nevertheless, he argued that Rodgers could testify about receiving the deeds, recording them, and about certain information that was on the documents, even if the trial court would not admit the deeds into evidence. Judge Ransom rejected his proffer of parol evidence. She explained:

> this is highly irregular . . . the proof of your client's claim
> that he is the rightful owner of the property is not based on
> any testimony that he might give, if I were to allow him to

---

Thus, Rule of Evidence 201(d) is an exception to the general rule that we must limit our scope of review to "only the materials in the certified [appellate] record when resolving an issue." ***Ruspi v. Glatz***, 69 A.3d 680, 691 (Pa. Super. 2013). The ***Ruspi*** Rule prevents undue surprise on appeal and ensures that the appellate court is not relying upon unsubstantiated facts. "The emphasis on the certified record is necessary because, unless the trial court certifies a document as part of the official record, the appellate judiciary has no way of knowing whether that piece of evidence was duly presented to the trial court or whether it was produced for the first time on appeal and improperly inserted into the reproduced record." ***Id.***

Unlike ***Ruspi***, where an appellant relied upon an extra-judicial "chain of e-mails from a year before the accident," ***id.*** at 690, the transcript that Calisto included with his supplemental brief carries the certification of the trial court's reporter, and we have no reason to doubt its validity. Moreover, Rodgers does not contest the authenticity or accuracy of that transcript. Thus, we are satisfied that the transcript Calisto provided us is a true and authentic record of the in-court proceeding of ***Rodgers v. Calisto*** (Court of Common of Philadelphia County Civil Docket No. 160901119), derived "from sources whose accuracy cannot reasonably be questioned," Pa.R.E. 201(b), *i.e.*, the Court of Common Pleas of Philadelphia County.

- 9 -

testify. The proof would be the fully recorded deeds, to which [Calisto] then could raise a defense or challenge it, if [he] wanted to [do so].

*Id.* at 25.

The trial court took a 30-minute recess to allow Rodgers time to get the full deeds from the Office of Records of Philadelphia County. He never returned. Judge Ransom dismissed his case with prejudice, because she concluded that Rodgers' testimony regarding transfer of property was insufficient as a matter of law. *See id.* at 27.

Thus, in the same dispute, between the same parties, on the issue of ownership of the same three properties, two judges of the same court, reached diametrically opposite conclusions. Rodgers did not appeal Judge Ransom's decision; therefore, it became a final judgment on February 25, 2019. As the conflicting judgments currently stand, neither Calisto nor Rodgers obtained quiet title to these properties.

Although he has defeated Rodgers' claim to ownership before Judge Ransom, Calisto challenges Judge Shreves-Johns' refusal to grant him quiet title in this matter.

### III. Analysis

Calisto raises three claims of error, which we reorder as follows:

1.  Did the lower court err, as a matter of law, by not allowing evidence of [Rodgers'] criminal conviction?

2.  Did the lower court err, as a matter of law, in misapplying the statute of frauds?

3.      Did the lower court commit errors of law by treating this case as competing claims of fraud, where none was pleaded by [Rodgers] and also by finding in [Rodgers'] favor when it did not require him to meet a burden of proof of clear and convincing evidence?

Calisto's Brief at 4.

*A.      Evidence of Criminal History*

First, Calisto seeks a new trial, because the trial court prohibited him from impeaching Rodgers based on his prior conviction of robbery.  While cross-examining Rodgers, Calisto's attorney asked, "Can you tell me if you've ever been convicted of any crime that involves dishonesty?"  N.T., 3/27/18, at 141-42.  Believing that Calisto needed to introduce certified records of a conviction to impeach a witness, counsel for Rodgers objected.  Calisto's lawyer had only a printout of a court docket.  ***See id.*** at 141-46.  He argued that the printout showed Rodgers was convicted of robbery and had a minimum sentence of three years; because Rodgers should have been released in 2009, the release date was within the ten-year period allowed for admission of the conviction under Pennsylvania Rule of Evidence 609.

Judge Shreeves-Johns sustained the objection, because Calisto's attorney did not have a certified copy of the court record.  In her opinion, she noted:

> the court determined that [Calisto's] counsel failed to present credible documentation of [Rodgers'] conviction. Instead of a certified record, [Calisto] presented an uncertified computer printout. N.T., 3/27/2018 at 142-46. Assuming, *arguendo*, [Rodgers'] conviction could have been properly admitted into evidence, this court does not believe that failing to admit it into evidence constitutes reversible

- 11 -

> error, as the court was aware that [Rodgers] had a criminal history. Despite having considered [Rodgers'] criminal past, this court made its determination based on the credibility of the parties' testimony with regards to the subject transaction. The court's decision would have remained the same even if [Rodgers'] past criminal conviction was admitted into evidence.

Trial Court Opinion, 11/28/18, at 9.

On appeal, Calisto argues Rodgers' conviction in 2006 for robbery (infliction of serious bodily injury)[4] is *crimen falsi*. In his view, the trial court should have admitted the evidence for impeachment purposes, under Rule 609. Calisto further asserts the misapplication of this rule was harmful error, because the court ruled in favor of Rodgers based on his credibility.

When reviewing an evidentiary ruling, this Court defers to the trial court, and we reverse in limited circumstances. As we have said:

> Admission of evidence is within the sound discretion of the trial court, and we review the trial court's determinations regarding the admissibility of evidence for an abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Czimmer v. Janssen Pharm., Inc.***, 122 A.3d 1043, 1058 (Pa. Super. 2015) (quoting ***Conroy v. Rosenwald***, 940 A.2d 409, 417 (Pa. Super. 2007)). An "abuse of discretion" is not merely an error of judgment. ***Paden v. Baker Concrete Constr., Inc.***, 658 A.2d 341, 343 (Pa. 1995). A trial court abuses its discretion by making a manifestly unreasonable, arbitrary, or capricious

---

[4] 18 Pa.C.S.A. § 3701(a)(1)(i).

- 12 -

decision; by failing to apply the law; or by allowing prejudice, bias, or ill will to influence its decision. ***See, e.g., Harman v. Borah***, 756 A.2d 1116, 1123 (Pa. 2000).

Pennsylvania Rule of Evidence 609 provides:

> **(a) In General.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.
>
> **(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
> > (1) its probative value substantially outweighs its prejudicial effect; and
> >
> > (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Pa.R.E. 609. Pursuant to subsection (a), when the conviction is less than ten-years-old, its admission is mandatory – the evidence of the conviction "***must*** be admitted." ***Id.*** (emphasis added). ***See also*** Pa.R.E. 609 Comment (stating, "Where the date or conviction or last date of confinement is within ten years of the trial, evidence of the conviction of a *crimen falsi* is *per se* admissible.").

"Robbery and burglary are considered *crimen falsi* and convictions for these offenses are admissible for impeachment purposes." ***Commonwealth v. Trippett***, 932 A.2d 188, 199–200 (Pa. Super. 2007). Rodgers does not

dispute this. Instead, he relies on his argument below – which the trial court adopted – that Calisto needed to produce the certified record of the conviction. Rodgers' contention has no support in either the language of the Rule or case law. Indeed, neither the trial court nor Rodgers cited any authority for the proposition that Calisto needed a certified record to impeach Rodgers' credibility.

The trial court grafted a certified-record requirement onto Rule 609, where none exists.[5] Thus, the court, by refusing to allow Calisto's attorney to cross-examine Rodgers regarding his prior conviction of robbery, failed to apply Rule 609 as written. It also overrode the comment to that Rule, which made evidence of Rodgers' robbery conviction "*per se* admissible." Pa.R.E. 609 Comment. This was an abuse of discretion, because Rule 609 and its comment leave no room for discretion in this scenario.[6]

However, erroneously barring evidence of a prior conviction to impeach a witness does not automatically result in a new trial. As mentioned, an

_____

[5] It appears that the trial court confused impeachment by prior conviction with authentication of evidence under Pennsylvania Rule of Evidence 902. We also note that trial courts may generally take judicial notice of prior violations and convictions under Pennsylvania Rule of Evidence 201. *See Commonwealth v. Taylor*, 137 A.3d 611, 617 n.1 (Pa. Super. 2016) (*en banc*).

[6] The only legitimate basis for excluding such convictions is under subsection (b) of Pennsylvania Rule of Evidence 609 – *i.e.*, if the prejudicial effect substantially outweighs the conviction's probative value or if the party seeking to impeach the witness did not provide timely notice. The trial court did not base its exclusion on either of these grounds, nor does Rodgers contend that either applies.

evidentiary error only warrants a retrial if the mistake harmed the appellant. ***See Czimmer***, ***supra.***

The trial court stated that it knew of Rodgers' prior conviction and, even if it had received the impeaching evidence, its credibility determination would not have changed. "[Calisto's] attempt to impeach the credibility of [Rodgers] would not alter the court's determination of [Rodgers'] credibility on this issue of the property transfer in the face of the entirety of what was presented at trial." Trial Court Opinion, 11/12/18, at 9. Because the trial court, who viewed the witnesses' body language and heard their testimony, was greatly convinced of Rodgers' honesty, its refusal to admit his conviction for purposes of impeachment was harmless error in this bench trial.

This issue affords Calisto no appellate relief.

B.    *The Statute of Frauds*

Next, Calisto asserts the trial court misapplied the statute of frauds regarding oral contracts for the transfer of realty. He claims his mother's will gave him title to the three townhomes, and no evidence proved, as a matter that of law, he granted those titles to anyone. **See** Calisto's Brief at 32. Thus, Calisto requested that the court, *inter alia*, enter judgment in his favor and direct the Clerk of Records in Philadelphia County to convey the properties to him. **See** Amended Complaint at 5.

In reply, Rodgers argues that, although the deeds identified the grantor as Joan Calisto (as opposed to Michael Calisto), this does not invalidate the transfer based on the totality of the facts surrounding the agreement. **See**

- 15 -

Rodgers' Brief at 4. "That the deeds bore [Joan Calisto's] name was not a technicality sufficient to dissolve the transaction." Rodgers' Brief at 5.

He further indicates that the trial court found, as a fact, that the parties entered a contract to sell the land and completed the transaction by exchanging the deeds for cash. Because the trial court found Rodgers' version of events was "credible, the facts support a finding that Calisto delivered a purchase agreement to [Rodgers], *see* trial exhibit P-4." *Id.* at 4. "The fact that the seller is identified as Joan Calisto, not Michael Calisto, does not invalidate the purchase agreement in light of the totality of the facts surrounding the agreement." *Id.* Moreover, he believes that the errors and irregularities within the Sales Agreement were only technical violations of the statute of frauds that we should overlook, because "the parties in fact entered into a valid agreement for the sale of real estate." *Id.* at 5.

The trial court, however, did not enforce this transaction based upon the Sales Agreement. Instead, it only held that the three deeds were "sufficient proof to satisfy the Statute of Frauds." Trial Court Opinion, 11/28/18, at 10.

The trial court opined as follows:

> [T]here was no conclusive proof at trial that the deeds for the properties, presented by and included in [Calisto's] case-in-chief, were forged. In fact, [Calisto] had every opportunity to submit into evidence copies of the deeds that he believed were the true and original deeds. Instead, [Calisto] submitted into evidence copies of deeds that were allegedly forged by [Rodgers] without any other proof of their falsity. It would seem logical that [Calisto], the executor and sole beneficiary of his mother's estate, would have access to the purported true deeds. [Calisto] argued

- 16 -

that [Rodgers] should have known that the deeds could not
be transferred by a decedent. However, [Rodgers] received
the deeds from [Calisto] without reason to question the
validity of the signatures as they were received from
[Rodgers] as executor and beneficiary of his mother's
property. Again, the testimony and evidence presented at
trial tipped the scales in favor of [Rodgers] based on the
weight of the evidence presented by both parties.

This court, having no concrete evidence to contradict
the validity of the deeds, finds that the Statute of Frauds
has been satisfied . . . The court has seen no evidence to
contradict the validity of the deeds themselves.

Trial Court Opinion, 11/28/18, at 10-11 (citation to transcript omitted).

The trial court therefore concluded that the deeds satisfied the statute

of frauds by a preponderance of the evidence; it did not consider or rely upon

the Sales Agreement to deny Calisto quiet title. Even so, we may sustain the

ruling below if the deeds are invalid but the Sales Agreement is enforceable,

because "this Court may affirm the decision of the trial court if it is correct on

any grounds." *Liberty Mutual Ins. v. Domtar Paper Co.*, 77 A.3d 1282,

1286 (Pa. Super. 2013), *affirmed*, 113 A.3d 1230 (Pa. 2015). We therefore

consider Rodgers' suggestion that the Sales Agreement serves as an

alternative basis to affirm the trial court's decision in detail below.

Initially, we recognize that this appeal arises from the trial court's decree

in Calisto's action to quiet title, in which Calisto invoked the equitable power

of the courts to amend the property records of Philadelphia County. When

reviewing equitable matters, our scope and standard of review is generally

deferential to the trial court.

- 17 -

> We will reverse only where the trial court was palpably erroneous, misapplied the law, or committed a manifest abuse of discretion. Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it. Moreover, the function of this Court on an appeal from an adjudication in equity is not to substitute our view for that of the lower tribunal; our task is rather to determine whether a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal. Additionally, we note that when reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence.

*Nebesho v. Brown*, 846 A.2d 721, 725-726 (Pa. Super. 2004) (citations and some punctuation omitted).

Significantly, Calisto has **not** challenged the factual findings of the trial court; thus, we must accept them as true. Here, the trial court found that, by a preponderance of the evidence, Rodgers and Calisto orally agreed that Calisto would sell the three properties for $150,000 cash and memorialized their understanding as the Sales Agreement. Hence, we accept that Rodgers likely paid Calisto the full purchase price, and Calisto likely gave Rodgers three deeds, bearing Joan Calisto's signatures. Thus, we must determine whether those deeds, which Calisto **probably** signed on behalf of his late mother and for which Rodgers **probably** paid $150,000 cash, satisfy the statute of frauds, as a matter of law.[7] As we explain, the deeds do not satisfy the statute of frauds, and the Sales Agreement is equally void under that statute.

_____

[7] This issue correlates to the now-final judgment of Judge Ransom in **Rodgers v. Calisto**, **supra**. Neither party suggested that the other decision obstructs

### 1. The Will and the Invalid Deeds

We begin our analysis by reviewing the statute of frauds, the will of Joan Calisto, and the three deeds in question.

The statute of frauds provides, in relevant part, "no . . . lands . . . shall . . . be . . . granted . . . unless it be by deed or note, in writing, ***signed by***

_____

our appellate review here. Calisto asserts Judge Ransom's decree was proper and should persuade us that "the decision [on appeal] should be reversed." Calisto's Supplemental Brief at 3. Rodgers contends that ***Rodgers v. Calisto*** was not a judgment on the merits. ***See*** Rodgers' Supplemental Brief at 2.

A judgment on the merits is one "based on the evidence rather than on technical or procedural grounds." BLACK'S LAW DICTIONARY 972 (10th ed. 2014). Judge Ransom ruled Rodgers had no competent evidence to prove ownership under the statute of frauds. Rodgers, therefore, failed to make his _prima facia_ case. Thus, contrary to Rogers' argument, this was an evidentiary-based decision – _i.e._, a judgment on the merits.

We also note that Calisto did not object to Rodgers' parol testimony before Judge Shreeves-Johns, as he did before Judge Ransom. Indeed, Calisto nearly waived the statute-of-frauds issue in this appeal. A party waives the statute-of-frauds defense:

> if he does not [raise it] by pleading specially or interposing a timely objection to testimony in support of the oral agreement, or by claiming its protection in some other manner that gives the opposition opportunity to meet the objection. . . . To permit a party to invoke the statute of frauds for the first time on appeal would be manifestly unfair.

***Sferra v. Urling***, 195 A. 422, 426 (Pa. 1937). Calisto did not plead the statute of frauds or object to Rodgers' testimony regarding the oral agreement. In fact, his attorney never even mentioned the statute of frauds during the two-day trial. He did, however, raise it in a motion for summary judgment (albeit it in front of a different judge) and in his pretrial statement. Because Judge Shreeves-Johns had the benefit of the pretrial statement and the filings gave Rodgers notice of the statute-of-frauds theory, we find this issue preserved.

- 19 -

*the party . . . granting . . . the same* . . . ." 33 P.S. § 1 (emphasis added).
It mandates "in effect that no agreement for the sale of real estate will be
enforced unless it is in writing and signed by the party to be charged." ***Fannin***
***v. Cratty***, 480 A.2d 1056, 1058 (Pa. Super. 1984).

Here, the trial court found that the three deeds satisfied the statute,
because Calisto probably delivered them to Rodgers in exchange for $150,000
cash. However, Rodgers' and Hattisha's testimony constitutes parol evidence.
Under the statute of frauds, their testimony was outside the trial court's scope
of review when deciding the issue of legal title, because the deeds were facially
invalid and Rodgers did not raise or satisfy the doctrine of part performance.
***See*** Note 8, ***infra***. Additionally, the trial court criticized Calisto for not
producing "the deeds that he believed were the true and original deeds." Trial
Court Opinion, 11/28/18 at 10. Faulting him in this manner ignores the
undisputed fact that Calisto produced his mother's will as written evidence of
his title.

As a matter of law, the trial court should have limited its inquiry to Joan
Calisto's will and the four corners of the deeds, because the only valid manner
for transferring an interest in land is "by deed or note, in writing . . . ." 33
P.S. § 1. According to the deeds, ***Joan*** Calisto transferred title to these three
properties, not ***Michael*** Calisto. Rodgers, however, conceded that Joan
Calisto had been dead for 15 years when he claimed to receive title and that
he was fully aware of that fact before he accepted deeds listing her as grantor.

At Joan's death, title to the properties passed to Calisto in her will. **See** 20 Pa.C.S.A. § 301(b) (directing that title to land immediately transfers at an owner's death to her heirs by operation of law). Hence, Joan Calisto had no title to grant in July 2016. The statute of frauds required the signatures of **Michael** Calisto (the current owner) in order for the deeds to have any legal effect.

Granted, courts liberally construe the statute of frauds when deciding what constitutes a valid signature. "The signature to a memorandum may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer." RESTATEMENT (SECOND) OF CONTRACTS § 134. "[T]here is no requirement in the statute [of frauds] or the decisional law that a signature be in any **particular** form. Instead, the focus has been on whether there is some reliable indication that the person to be charged with performing under the writing intended to authenticate it." **Hessenthaler v. Farzin**, 564 A.2d 990, 993 (Pa. Super. 1989) (emphasis in original).

Even given liberal construction, the signatures on these deeds give no indication — much less a reliable one — that Michael Calisto authored them. The three signatures are identical, and they appear to match the signatures of Joan Calisto on a mortgage that she signed during her lifetime. **See** N.T., 3/26/18, 41-42. As such, no reasonable person could conclude from the face of the deeds alone that Michael Calisto signed those writings. Because the

deeds were not "signed by the party [allegedly] granting" title, the deeds do not satisfy the statute of frauds. 33 P.S. § 1.

The trial court concluded Calisto signed his mother's name as her executor, but the writings themselves contradict that holding.[8] If the signature line on the deeds had read "Joan Calisto, by the Executor of her Estate, Michael Calisto" (or something similar), the writings themselves would support the trial court's conclusion. They do not.

Historically, when, as here, a supposed grantor's signature stands alone and another allegedly signed for her, such a signing can be valid only "if the grantor's name be affixed by another *in the grantor's presence* and by [her] oral direction . . . ." Browne, A TREATISE ON THE CONSTRUCTION OF THE STATUTE OF FRAUDS AS IN FORCE IN ENGLAND AND THE UNITED STATES § 12(b) (5th ed. 1895) (emphasis in original). Obviously, no one signed Joan Calisto's name in her

---

[8] While we may affirm the trial court's decision on any grounds, such as the equitable doctrine of part performance, Rodgers' tendering of the full purchase price, without more, is insufficient to invoke that doctrine. The part-performance doctrine applies if a purchaser proves that he "paid consideration for the land; that the buyer took possession of the land; that the buyer's harm could not be compensated in damages; and that a rescission would be manifestly unfair." *Firetree, Ltd. v. Dep't of Gen. Servs.*, 978 A.2d 1067, 1074 (Pa. Cmwlth. 2009) (citing *Greenwich Coal & Coke Co. v. Learn*, 83 A. 74 (Pa. 1912)). *See also Zuk v. Zuk*, 55 A.3d 102 (Pa. Super. 2012) (affirming an equitable decree for the specific performance of an oral contract for land, because the purchasers produced a canceled check for the down payment, entered the property, and made substantial improvements to the previously undeveloped lot). Here, Rodgers has not entered into possession of the townhouses, nor has he made any improvements. Thus, equity may not specifically compel Calisto to perform the oral contract and transfer title to Rodgers on these facts.

presence, at her oral direction, in 2016. The deeds, on their face, do not support the trial court's factual finding that Calisto likely signed them on behalf of his mother or her estate, and the statute of frauds bars a trial court from finding that the parties transferred an interest in real estate by a simple preponderance of the parol evidence.

In **Kurland v. Stolker**, 533 A.2d 1370, 1372 (Pa. 1987), the Supreme Court of the Pennsylvania, when faced with a real-estate transaction that the alleged seller argued violated the statute of frauds, rejected the chancellor's application of the more-likely-than-not standard for fact finding as legally insufficient. There, as here, the parties presented competing stories regarding a sale of land, and the person asserting that he purchased the property failed to produce legally sufficient writings. He therefore asked the court of equity to enforce the parties' agreement based on parol evidence. The chancellor found the buyer's testimony and other parol evidence more credible than the record titleholder's evidence and testimony disproving the sale. The court of common pleas therefore entered a decree favoring the buyer.

On appeal, this Court affirmed in a *per curiam* order adopting the decree of the chancellor. The Supreme Court reversed and held that the buyer's parol evidence was legally insufficient to prove that a sale had occurred, such that equity could force the alleged seller to relinquish his title.

The **Kurland** Court explained that, given the heightened risk of perjury on both sides of a land transaction, the General Assembly has dictated through the statute of frauds that parol evidence is at its weakest in cases where the

buyer cannot produce a legally enforceable writing. Moreover, the party seeking to prove a transfer of land by parol evidence must satisfy a burden of proof even greater than the "beyond reasonable doubt" standard of criminal cases. "Land is the most important and valuable kind of property . . . there is no other stake for which man will play so desperately. In men and nations, there is an insatiable appetite for lands, for the defense or acquisitions of which money and even blood sometimes are poured out like water. The evidence of land-title ought to be as sure as human ingenuity can make it." *Kurland v*, 533 A.2d at 1372 (quoting *Moore v. Small*, 19 Pa. 461 (1852)). "But, if left in parol, nothing is more uncertain, whilst the temptations to perjury are proportioned to the magnitude of the interest." *Id.*

"The object of the statute [of frauds] is to prevent the assertion of verbal understandings in the creation of interests or estates in land and to obviate the opportunity for fraud and perjury." *Id.* Moreover, we presume a would-be buyer knew the statute of frauds and its demands *prior to* commencing a land transaction. *See id.* Where, as here, a person pays for land without taking a legally sufficient deed, that person "has acted with great negligence and folly . . . ." *Id.* at 1373 (quoting *Hart v. Carrol*, 85 Pa. 508, 511 (1877)). If he later "requests a court to interfere for him, and save him from the consequences of his own disregard of the law, when he asks the court to decree in his favor, in the face of the letter of the law, he should be held rigidly to full, complete, satisfactory, and indubitable proof." *Id.*

Therefore, the **Kurland** Court held that the level of "indubitable proof" necessary for parol evidence to satisfy the statute of frauds "is evidence that should not only be found credible, but of such weight and directness as to make out the facts alleged **beyond a doubt.**" **Kurland**, 533 A.2d at 1373 (emphasis in original). Furthermore, the party seeking to avoid the statute of frauds has the burden of proof. **See id.** at 1376. Thus, in the instant case, the trial court erred by placing the burden of proof upon Calisto to show that the statute of frauds applied, rather than placing it upon Rodgers to prove satisfaction of the statute by "such clearness and directness as will leave no doubt as to [the evidence's] meaning and purpose." **Id.** at 1373. As a matter of law, Rodgers' parol evidence was legally insufficient to meet the "beyond a doubt" standard of **Kurland** to take a transaction outside the statute of frauds.

First, the deeds' dates cast doubt upon Rodgers' story. He testified that he met Calisto on July 13, 2016 and that they consummated the sale on or around July 26, 2016, but the deeds bear an execution date of July 7, 2016.

Second, Rodgers only offered his word against Calisto's to prove that Calisto signed his mother's name and vouched that this would legitimatize the transaction. While the trial court found Rodgers more credible than Calisto and that his story was probably true, the preponderance-of-the-evidence standard of proof and Rogers' uncorroborated testimony leave room for doubt, in violation of **Kurland**.

Third, the testimony of Rodgers and Hattisha regarding the transfer of the deeds and the cash do not coincide. Under Rodgers' version, the exchange occurred inside one of the properties and lasted about 15 minutes:

> It didn't just happen just that fast. We went inside the house. We went inside the house. The money was in denominations. It was all in hundreds so there wasn't no need to really count it up. They were band up as far as, you know, bands and sort of denominations. It wasn't no need to really, you know, count, so we was in there for about ten, 15 minutes.

N.T., 3/27/18, at 58. However, Hattisha recounted that the whole transaction occurred outside; "they was standing on the sidewalk [and] . . . I seen that Mr. Calisto had a folder in his hand. I've seen him do a transaction," she said. **Id.** at 17, 19. Even though the trial court found Rodgers and Hattisha credible, their contradictory testimony "is not the full, complete, satisfactory, and indubitable proof required by our law." **Kurland**, 533 A.2d at 1375.

Lastly, Rodgers' bank statements, although a writing, do not satisfy the statute of frauds. Bank statements, unlike a cancelled check, do not prove beyond doubt that Calisto received any money from Rodgers. Without Rodgers' parol evidence to explain where he spent the withdrawn cash, his bank statements prove only that he withdrew money, when, and where those withdraws occurred.

Hence, even though the trial court found Rodgers' testimony more credible and that Rodgers and Hattisha "tipped the scales," Trial Court Opinion, 11/28/18, at 11, tipping the scales is not enough proof to satisfy the

statute of frauds. Rodgers therefore provided legally insufficient proof to enforce the facially invalid deeds by parol evidence. Rodgers' parol evidence to revise the deeds is "of an equivocal character; [it does not] have such clearness and directness as will leave no doubt as to [the parties'] meaning and purpose." **Kurland** at 1373. "If titles to land are to be proved in the manner that this record presents and if [trial judges and this Court] are to act on doubtful parol proof . . . they would annul the wholesome provisions of the statute in search of a visionary equity and introduce into the community the very evils which the legislature intended to remedy." **Id.** at 1375.

Under **Kurland**, the trial court needed to find **beyond a doubt** that this land transaction occurred. It did not. If more-likely-than-not credibility determinations may reform facially invalid deeds, then the statute of frauds is dead. Because Rodgers lacked valid deeds and parol evidence of proving the transaction beyond a doubt, the trial court should have quieted title in Calisto under the only valid evidence of title – the will of Joan Calisto.

2. The Sales Agreement

Having explained the trial court's misplaced reliance upon the facially invalid deeds to defeat the statute of frauds, we turn to Rodgers' suggestion that we may alternatively affirm based on the Sales Agreement.[9]

_____

[9] The Sales Agreement reads, in pertinent part, as follows:

    **I.**     **PARTIES TO CONTRACT – PROPERTY.** Purchaser and Seller acknowledge that Broker is PRIME TIME

REALTY . . . as authorized by Purchaser and Seller, **MICHAEL RODGERS** hereinafter referred to as

Purchaser, offers and agrees to purchase from **JOAN CALISTO**
hereinafter referred to as Seller . . . the property legally described as:

BELOW LISTED PROPERTIES

**EARNEST MONEY DEPOSIT.** Earnest Money in the amount of ($ 150,00) [*sic*]
ONE HUNDRED AND FIFTY THOUSAND DOLLARS Cash X Check_____,
Unless otherwise noted herein, shall be deposited into the trust account of the listing broker, PRIME TIME REALTY on the next legal banking day after acceptance of this offer.

Other earnest money provisions: $10,000 Down Payment to be credited toward purchase price.

**2.** **PURCHASE PRICE.** The total purchase price is to be ($ 150,000), ONE HUNDRED AND FIFTY THOUSAND DOLLARS

_____

After earnest money herein is credited, the remaining balance is to be paid by Purchaser at closing.

**SALE OF PURCASER'S PROPERTY**

A. **This offer is not contingent** upon the sale or close of property owned by Purchaser.

B. **This offer is contingent** upon the sale and close of Purchaser's property located at

1. 424 n. 32nd Street
2. 647 n. 16th Street
3. 651 n. 16th Street

_____

\* \* \* \* \* \*

**This Sale of the Properties is, As-Is because of the Dilapidated and needed Repairs of each of the Following Properties. The Buyer will assume all Liens and L&I Violations.**
4.    424 n. 32nd Street
5.    647 n. 16th Street
6.    651 n. 16th Street


INITIALS: PURCHASER _____/ _____ SELLER _____/

**TIME IS OF THE ESSENCE OF THIS CONTRACT.**

Dated this 7 day of July 2016 at 3 a.m./p.m.


_____

Purchaser

On this 7 day of July, 2016 the foregoing offer is:

(Initial) **ACCEPTED  X**

          **NOT ACCEPTED _____**

          **COUNTERED _____**


Seller _____*J.C.*_____
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**THE FOLLOWING IS FOR INFORMATIONAL PURPOSES ONLY:**

PRIME REAL ESTATE, LLC

_____*[Illegible Signature]*_____
Selling Company

Calisto's Exhibit – 4 (italics indicates handwritten portions of contract).

Initially, we observe that, like the deeds, the Sales Agreement indicates that Joan Calisto and Rodgers executed it a week **prior to** Rodgers' initial meeting with Calisto. The Sales Agreement also contains many internal inconsistences. For example, the identity of the "Seller" in the contract's terms and the so-called "Selling Company" do not match. Also, the earnest money lists two amounts — $150,000, which is the full, purchase price, and $10,000 as a down payment. Hence, this provision is internally inconsistent.

Additionally, the contingency provisions can never be fulfilled. The Sales Agreement is conditioned on Rodgers' sale and close of these same properties. On July 7, 2016, Rodgers did not yet own these three properties, so, on its face, Rodgers could **never** fulfill the condition precedent for this sale. Moreover, several of the form contract's terms – such as survey costs, building inspections, and seller's disclosures – remained incomplete. The author of the contract also failed to identify the properties at issue by referencing any deed books or parcel-identification numbers. In fact, the author only listed three addresses and did not indicate in which city, county, or state those addresses are located.

Finally, and, most importantly, the Sales Agreement is **not** a contract between the parties at bar.

"The meaning of an unambiguous contract presents a question of law for which our review is *de novo*." **Lesko v. Frankford Hosp.-Bucks Cty.**, 15 A.3d 337, 342 (Pa. 2011).

When interpreting contract language, we are to ascertain the intent of the parties. "If the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties." *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 909 (Pa. 2019). "A contract's terms are considered ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* (quotation marks omitted).

Also, if "an unconditional agreement has been made for the sale of land, such as equity will specifically enforce, [the land] may properly be referred to and treated as sold. Then the [buyer] becomes the equitable owner, and the [seller] holds the legal title as trustee." *Byrne v. Kanig*, 332 A.2d 472, 474 (Pa. Super. 1974). Thus, if this Sales Agreement were valid, we would have no trouble concluding that an equitable conversion had occurred, assuming Rodgers had argued for such a conversion. He did not. In that case, Calisto would have only held legal title in trust until the day that Rodgers paid the purchase price in full. *See id.* Here, however, the Sales Agreement is, by its plain and unambiguous terms, conditional.

The parties to this Sales Agreement unambiguously conditioned its becoming executory upon Rodgers successful transferring title to the very properties he had yet to acquire *under **this** Sales Agreement* – a factual and legal impossibility. *See* Calisto's Exhibit – 4 at 2. By its own, clear terms then, the Sales Agreement is perpetually conditional.

Therefore, equity can only deem this Sales Agreement unconditional and find an equitable conversion by overriding the fundamentals of contract law. This, of course, equity may not do, because "equity follows the law." *First Fed. Sav. & Loan Ass'n of Lancaster v. Swift*, 321 A.2d 895, 898 (1974). For it has been said, "Equity had come not to destroy the law, but to fulfill it." F.W. Maitland, LECTURES ON EQUITY at 17 (1909). Equitable enforcement of this Sale Agreement to find an equitable conversion would destroy, rather than fulfill, the law of contracts. Accordingly, because this Sales Agreement is, as a matter of contract law, forever conditional, equity may not manufacture an equitable conversion in favor of Rodgers pursuant to the plain language of this Sales Agreement.

Furthermore, because a sales agreement has the same effect in equity as a deed has at law, such a contract, under the statute of frauds and the parol-evidence rule, is subject to the same degree of judicial scrutiny as a deed. Like the Joan-Calisto-to-Rodgers deeds, this Sales Agreement must also stand upon the contents of its own four corners, without recourse to parol evidence.

As this Court has explained, "Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but *the only, evidence* of their agreement." *PNC Bank, Nat. Ass'n v. Bluestream Tech., Inc.*, 14 A.3d 831, 841 (Pa. Super. 2010) (emphasis added). This rule mandates that the

parties' written "terms and agreements **cannot be added to** . . . by parol evidence." **Id.** (emphasis added).

"One exception to the parol-evidence rule applies for cases of fraud in the execution in which the party proffering the evidence contends that he executed the agreement because he was defrauded by being led to believe that the document contained terms that actually were omitted therefrom." **Youndt v. First Nat. Bank of Port Allegany**, 868 A.2d 539, 546 (Pa. Super. 2005). Rodgers did not claim Calisto made him believe the Sales Agreement contained terms that it does not. In fact, Rodgers' Answer and New Matter did not allege fraud at all.

Rodgers also does not ask this Court to find fraud in the inducement of this contract, even though the trial court's factual findings may support such a theory. **See id.** Fraud in the inducement simply does not fit Rodgers' ends of acquiring title, because, if we were to find fraud in the inducement, the remedy is the same as the statute of frauds. Fraud-in-the-inducement "theory holds that, since fraud induced the agreement, no valid agreement came into being and parol evidence is admissible to show that **the alleged agreement is _void_**." **Youndt**, 868 A.2d at 546 (2005) (emphasis added). Thus, even accepting the trial court's findings as true – *i.e.*, that Calisto fraudulently induced Rodgers to pay the $150,000 for deficient deeds – title still cannot transfer to Rodgers under this void contract.

In addition, the parol-evidence rule carries considerably more force when a court is reviewing a writing for the sale of land. In such cases, the

parol-evidence rule unites with the statute of frauds; together, they forbid a court from enforcing any writing that parol evidence has altered. The Supreme Court of Pennsylvania, more than a century ago held that a "court of equity cannot vary or rectify by parol an executory agreement in writing for the sale of lands, and as thus varied, in the absence of an estoppel, specifically enforce performance of it. . . . [W]here a written agreement is varied by oral testimony, the whole contract in legal contemplation **becomes parol.**" **Safe Deposit & Tr. Co. of Pittsburg v. Diamond Coal & Coke Co.**, 83 A. 54, 58 (Pa. 1912) (emphasis added). "When, therefore, a party to an executory agreement in writing for the sale of lands succeeds in reforming it by oral testimony, he reduces the whole agreement to a parol contract." **Id.** "He pulls down the house on his own head. When he converts the writing into an oral agreement, the statute [of frauds] declares it to 'be void.'" **Id.**[10]

The statute of frauds demands that a writing for the sale of land "contain a sufficient statement of the terms of the agreement and the signature of the grantor." **In re Estate of Dotterer**, 579 A.2d 952, 954 (Pa. Super. 1990). Here, the Sales Agreement, by its plain and unambiguous language, fails to

_____

[10] We note that, when "a written instrument fails to express the intention of the parties by reason of fraud, accident, or mistake, the injured party may invoke the equitable jurisdiction of the court which, by the aid of parol testimony, may reform it." **Safe Deposit & Tr. Co. of Pittsburg v. Diamond Coal & Coke Co.**, 83 A. 54, 57 (Pa. 1912). Here, unlike in **Safe Deposit**, Rodgers did not aver a count of fraud against Calisto. Nor did Rodgers allege an accident or mistake in the contract's formation. Thus, those issues are not present in this case.

- 34 -

do either. This contract fails to identify the parties, the properties it governs, and does not contain a signature of the grantor.

The Sales Agreement indicates that it is a contract between Joan Calisto and Rogers. As such, on its face, this contract does **not** govern the relationship of these parties. Only by resorting to Rodgers' parol testimony regarding negotiations, formation, and the signing of this Sales Agreement can he convert the contract from what it is (a contract between Joan Calisto and Rodgers) into something it is not (a contract between Michael Calisto and Rodgers).

The Sales Agreement also lacks the most essential term, because it does not state with any degree of reliability which properties it transfer. The agreement lists three addresses, without reference to a deed book, parcel-identification numbers, a city, a county, or a state. Thus, it cannot be determined within the four corners of the contract where one may locate them or their metes and bounds. A writing "which omits or incompletely states the essential terms . . . is insufficient." **Target Sportswear, Inc. v. Clearfield Foundation**, 474 A.2d 1142, 1148 (Pa. Super. 1984).

The only way that this Sales Agreement has any meaning at all is if we rely upon Rodgers' legally insufficient, parol evidence to identify which properties the agreement governs and to conclude that the names "Joan Calisto" and "Prime Real Estate, LLC" actually mean "Michael Calisto." If we, in equity, were to allow such parol testimony to alter the Sales Agreement, based upon the trial court's findings, then we would be reforming the contract

from one between Joan Calisto and Rodgers to one between Michael Calisto and Rodgers. We would likewise need to reform it from one that governs the sale of no properties in particular – *i.e.*, three, indeterminate address in some, unidentified city or town – into a contract specifically for the sale of Calisto's three townhomes. Without parol evidence, it is impossible to know which properties this contract is purporting to sell. This Sales Agreement epitomizes uncertainty in land transactions, the very ill that the General Assembly sought to curtail with the statute of frauds. *See Kurland*, *supra*.

In essence, Rodgers asks us to use the equitable powers of this Court to transform the Sales Agreement from a writing into a parol agreement. As *Safe Deposit* establishes, if we were to reform the Sales Agreement and thereby convert it from a writing to a parol agreement, the statute of frauds blocks us from enforcing it, as surely as the statute blocked our enforcement of the facially invalid deeds that Rodgers recorded. In the end, Judge Ransom correctly opined, "the proof of [Rogers'] claim that he is the rightful owner of the property is not based on any testimony that he might give . . . ." *Rodgers v. Calisto*, N.T., 2/12/19, at 25. For when Rodgers gives such testimony to reform the Sales Agreement or to edit the facially invalid deeds, he "pulls down the house on his own head." *Safe Deposit*, 83 A. at 58.

With or without out equitable reformation, Rodgers' alternative theory that he may take title to the townhomes under the Sales Agreement fails. Without reformation, the contract hangs in legal limbo. It is a perpetually conditional, non-executory, contract with a woman who was deceased when

he typed his "X" onto it, for the sale of three, unidentified properties. With reformation, Rodgers has only a parol agreement, which the statute of frauds renders unenforceable as a matter of law. Either way, the July 7, 2016 Sales Agreement, between the late Joan Calisto and Rodgers, is an insufficient basis to affirm Judge Shreves-Johns' decision.

While we understand that this result likely appears harsh from Rodgers' perspective, the Supreme Court said, a buyer of real estate "is presumed to know that the law requires, as evidence of the title to land, that the contract must be made in writing." *Kurland*, 533 A.2d at 1373. This writing only applies to these parties if Rodgers resorts to parol evidence and thereby converts it to an unenforceable parol, agreement. Thus, he has not taken the proper and legal evidence that the law requires to transfer title to land. A for-cash buyer "has acted with great negligence and folly [if he has] paid his money without taking the proper and legal evidence." *Id.* (quoting *Hart* at 511).

Calisto's second claim of error is meritorious. The statute of frauds invalidates Rodgers' deeds and renders the Sales Agreement void. However, our analysis does not end here.[11]

C.    *Balancing the Equities*

_____

[11] Because Calisto proved he deserves an equitable decree quieting title to the three properties, we dismiss his third claim of error, regarding how the trial court viewed the procedural posture, as moot.

Turing to the equities at issue in this case, the heightened scrutiny of **Kurland**, **supra**, no longer applies, and, therefore, the factual findings of the trial court by a preponderance of the evidence once again carry their usual, binding authority upon this Court. As mentioned, Calisto did **not** appeal the basic premise of the trial court's factual findings — *i.e.*, that he more-likely-than-not took $150,000 from Rodgers by giving him invalid deeds. Thus, equity will not sit idly by while Calisto unjustly enriches himself with Rodgers' purchase money.

The jurisprudence of this Commonwealth has long recognized important principles of equity. Nearly a century ago, we held that when one requests equity from the court, he must do equity. **Smith v. Yellow Cab Co.**, 135 A. 858, 860 (Pa. 1927) ("he who would have equity must do equity.") An equitable decree in one's favor must not harm those who are, or may be, affected thereby. **Id.** Consequently, when a party invokes the equitable powers of a court, equity may do justice for all of the litigants and vindicate their legal rights simultaneously. **See Ezy Parks v. Larson**, 454 A.2d 928, 936 (Pa. 1982).

In granting Calisto the equitable relief he sought, this Court is therefore empowered to return both parties to the positions they occupied before this unenforceable transaction for the sale of land. Under the facts as found by the trial court, Rodgers is entitled to restitution damages. Such damages may "be imposed for breach of an oral agreement . . . notwithstanding the fact that the statute of frauds rendered the oral agreement unenforceable for specific

performance." **Fannin**, 480 A.2d at 1059. "A party who would otherwise have a claim in restitution under a contract is not barred from restitution for the reason that the contract is unenforceable by him because of the Statute of Frauds." **Wilson v. Parker**, ____ A.3d ____, _____, 2020 WL 400240 *9 (Pa. Super. 2020) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 375). Consistent with the purpose of the statute of frauds, the award of such damages does not enforce the oral contract, but rather nullifies it. **See Wilson.** Having set aside the oral contract between Calisto and Rodgers to purchase the townhouses, equity requires Calisto to return the $150,000 he received from Rodgers for these properties.

## IV. Conclusion

In sum, we vacate the order denying Calisto's motion for post-trial relief and remand for the entry of a decree that Calisto, under his mother's will, has good and legal title to the three townhouses, as against the whole world (*i.e.*, an award of quiet title in favor of Calisto). In addition, as Calisto requested in his complaint, the trial court shall direct the Department of Records in Philadelphia to ensure that the chain of title for the three properties comports with this decision. Lastly, the trial court shall order Calisto to pay Rodgers $150,000 (plus interest since the date of the invalid deeds' recording)[12] in

---

[12] **See Wilson v. Parker**, ____ A.3d ____, 2020 WL 400240 (Pa. Super. 2020) (awarding interest on the purchase price when the statute of frauds nullifies a sale of land).

restitution and enter a judgment to that effect in favor of Rodgers. The trial court shall retain jurisdiction over the parties until they carry out its order.

Judgment and order denying post-trial relief vacated. Case remanded for further proceedings consistent with this decision.

Jurisdiction relinquished.

President Judge Emeritus Ford Elliott joins the memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/6/20