**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-2264**

_____

WALTER R. DAVIS,

          Plaintiff - Appellee,

    v.

BIMBO FOODS BAKERIES DISTRIBUTION, LLC, f/k/a Bimbo Foods Bakeries
Distribution, Inc.,

          Defendant - Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.  (8:22-cv-00663-PJM)

_____

Argued:  October 21, 2025                    Decided:  January 8, 2026

_____

Before DIAZ, Chief Judge, THACKER and RUSHING, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Thacker wrote the opinion, in which Judge
Rushing joined.  Judge Rushing wrote a concurring opinion.  Chief Judge Diaz wrote a
dissenting opinion.

_____

**ARGUED:**  Randall Mark Levine, MORGAN, LEWIS & BOCKIUS LLP, Washington,
D.C., for Appellant.  Daniel Robert Miktus, AKERMAN LLP, Washington, D.C., for
Appellee.  **ON BRIEF:**  Michael J. Puma, Shannon L.C. Ammon, MORGAN, LEWIS &
BOCKIUS LLP, Philadelphia, Pennsylvania, for Appellant.  J. Travers Clark, AKERMAN
LLP, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

THACKER, Circuit Judge:

The issue in this case is whether the distribution agreement Walter Davis ("Appellee") entered into with Bimbo Foods Bakeries Distribution, Inc. ("Appellant") extends to an automated fulfillment center within his contractual territory. The district court held that it does.

We hold that the district court correctly considered parol evidence and reasonably construed the distribution agreement as encompassing the fulfillment center. Accordingly, we affirm.

## I.

Appellant is a manufacturer of baked goods. In addition to its namesake pastry brand, it also produces goods under popular labels such as Sara Lee and Entenmann's. But Appellant does not distribute its own products. Instead, it sells third parties the right to wholesale its products to retailers, restaurants, and other vendors within exclusive territories. Appellee is one of those distributors. On January 10, 2011, Appellee executed one of Appellant's standardized distributor contracts and purchased the exclusive right to distribute its products in Frederick County, Maryland (the "Distribution Agreement").

The Distribution Agreement grants Appellee the right to distribute to "Outlets" within his territory. J.A. 41.[*] Per the Distribution Agreement, "Outlets" is defined as "all retail stores restaurants [sic] and institutional accounts which purchase Products by store door delivery." Id. at 41, 59. But that term specifically excludes "street vendors or any

---

[*] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery." *Id.* at 59. The terms "retail store" and "store door delivery" are left undefined.

A separate portion of the Distribution Agreement, Section 4.1, obliges Appellee to "maximize [his] purchases" from Appellant by maximizing sales to the Outlets within his territory. It specifically requires, where appropriate, that Appellee stock shelves with Appellant's products, rotate old products forward, replace stale products, and put up promotional materials. The parties agree that the scope and substance of these obligations depend entirely on the preferences of the Outlet being serviced, as determined by the Outlet's management. The reason for this is that some Outlets prefer to stock their own shelves, while others, such as "restaurants and institutional accounts," have no shelves at all. J.A. 59.

Nearly a decade after entering into the Distribution Agreement, in February 2020, Appellee learned that Kroger planned to bring its first automated grocery fulfillment center to Maryland -- that is, one operated primarily by robots. Direct consumers would not be allowed inside. Instead, the facility would only supplement the inventories of nearby brick and mortar stores and fulfill orders from online consumers. Not even the distributors supplying the fulfillment center's inventory would be permitted inside but would instead leave their deliveries at the loading dock for processing by the center's limited staff and its army of robots.

Appellant indicated that it would use a distributor other than Appellee to service the fulfillment center. So, Appellee sued in federal court for anticipatory breach of the

4

Distribution Agreement, seeking 1) a declaration that the facility is an "Outlet" within the meaning of the Distribution Agreement, and 2) an injunction preventing Appellant from using other distributors to service the center. Appellant nonetheless contracted with another distributor for the right to service the facility.

The district court held a four day bench trial in November 2023. Because the parties agree that the fulfillment center is within Appellee's territory, the only question before the court was whether the fulfillment center qualifies as an "Outlet." The answer turns on two sub-questions: 1) whether the fulfillment center is a "retail store" and 2) whether it purchases its inventory by "store door delivery."

The district court noted that neither term was defined in the Distribution Agreement and that available dictionary definitions did not clearly foreclose the meaning advocated by either party. It thus held that both terms are ambiguous in the context of this case. To resolve that ambiguity, the court then looked to parol evidence, including industry custom, relevant authorities, and the parties' course of performance. After considering each, the district court found that the center is an "Outlet" within the meaning of the Distribution Agreement. The court thus held that Appellee had the right to distribute Appellant's products to the facility and entered a declaratory judgment to that effect. It also awarded him court costs and more than $450,000 in lost revenue.

This timely appeal followed.

II.

We review a district court's contract interpretation de novo and, following a bench trial, its factual findings for clear error. *Harrell v. DeLuca*, 97 F.4th 180, 189 (4th Cir. 2024). A finding is clearly erroneous if we are left with the "definite and firm conviction" that it is incorrect. *In re Parker*, 141 F.4th 583, 587 (4th Cir. 2025).

III.

Here, the Distribution Agreement stipulates that the parties' disputes will be governed by Pennsylvania law. In that state, the contracting parties' intent controls. *Com. ex rel. Kane v. UPMC*, 129 A.3d 441, 463 (Pa. 2015). If contract terms are facially clear and unambiguous, the court enforces their plain meaning. *Id.*

But if, in the context of a particular case, a term is reasonably susceptible to more than one meaning, the court may also look to parol evidence to discern the parties' intent. *UPMC*, 129 A.3d at 463; *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009). Whether a term is ambiguous is a question of law. *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). But the ultimate meaning of an ambiguous term is a question of fact. *Titus*, 976 A.2d at 483; *see also* 16 Summ. Pa. Jur. 2d Commercial Law sections 1:92–93, 1:95. Consequently, a factfinder's interpretation of an ambiguous term in a contract governed by Pennsylvania law is reviewed only for clear error. *See Brown v. Baltimore & Ohio R. Co.*, 805 F.2d 1133, 1140–41 (4th Cir. 1986) (reviewing a district court's interpretation of an ambiguous contract term for clear error).

Our dissenting colleague would have us apply only the most common meaning of a given term divorced from the specific context of the case. *See post* at 18 ("When a contract

6

is clear and unambiguous, Pennsylvania courts instruct us to limit our review to its four corners. It follows that we must construe words of common usage according to their natural, plain, and ordinary sense.") (citations omitted) (cleaned up). But the Pennsylvania Supreme Court has repeatedly stated, "[a] contract's terms are considered ambiguous if they are subject to more than one reasonable interpretation *when applied to a particular set of facts*." *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 909–10 (Pa. 2019) (emphasis supplied); *UPMC*, 129 A.3d at 463 (same); *Titus*, 976 A.2d at 483 (same); *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (same); Mad*ison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (same); *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 145 A.2d 672, 676 (Pa. 1958) (same). In Pennsylvania, meaning requires context.

For example, in *Insurance Adjustment Bureau, Inc. v. Allstate Insurance Co.*, cited by the dissent, the Pennsylvania Supreme Court reiterated,

> When . . . an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. *A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense*.

905 A.2d 462, 481 (Pa. 2006) (emphasis supplied) (citations omitted). But the dissent relies on cases concerning the interpretation of insurance policies, which in Pennsylvania are a special subset of contracts subject to unique rules. *See post* at 18–19 (citing *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (quoting *401 Fourth Street v. Investors Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005))

7

("[W]hen a provision in the [insurance] policy is ambiguous, 'the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.'")).

As a result, we are compelled by Pennsylvania law to assess whether the parties' proffered interpretations are reasonable within the context of this case, and not whether they comport with the most common uses of the terms at issue.

## A.
### Are "retail store" and "store door delivery" ambiguous in the context of the parties' agreement?

### 1.
### <u>"Retail Store"</u>

We first decide whether the parties reasonably dispute the meaning of the term "retail store" as used in the Distribution Agreement. *See UPMC*, 129 A.3d at 463; *Titus*, 976 A.2d at 483.

Appellant argues that the term is unambiguous and does not encompass the fulfillment center. To support this position, Appellant directs us to Merriam-Webster's Dictionary, which defines "retail store" as "a place of business usually owned and operated by a retailer but sometimes owned and operated by a manufacturer or by someone other than a retailer in which merchandise is sold primarily to ultimate consumers." *Retail Store*, Merriam-Webster (last accessed Jan. 7, 2026), [https://perma.cc/48ZD-VEYF]. This definition, Appellant claims, proves that the term encompasses only facilities where consumers who are physically present exchange tender for goods. Because almost no one is allowed inside the fulfillment center, Appellant concludes that it cannot be a retail store.

8

For further support, Appellant points to the trial testimony of Dr. Richard J. George, a professor of food and marketing at St. John's University in Philadelphia. He testified that in customary industry usage, a "retail store" is a place where "customers can come in" and which relies for its success on "shelving, displaying, [and] merchandising" its offerings. J.A. 2433. However, Dr. George was unable to identify any external authorities to support his proposed definition.

Appellee disagrees with Appellant's characterization. He argues that the Merriam-Webster definition encompasses fulfillment centers that service online consumers, as the center at issue does. The crucial distinction Appellee makes is between where a good is bought and where it is sold. He highlights that an online consumer *buys* from their web-accessible device, but the retailer *sells* from wherever its goods are at the moment of purchase. Consequently, according to Appellee, the fulfillment center is a retail store because it houses goods sold to online consumers and ships them directly to their purchasers. He also notes that the Merriam-Webster definition encompasses facilities owned by non-retailers, undermining Appellant's point of sale argument. Finally, Appellee directs us to the trial testimony of three former employees of Appellant. Each of those witnesses testified that fulfillment centers like the one at issue existed at the time the parties entered their contract, and that the conventional industry understanding of "retail store" at that time encompassed any entity that "[sold] product to [the final] consumer." J.A. 2432–34. We determine this to be, at a minimum, compelling evidence of a reasonable disagreement as to the meaning of "retail store."

9

Here, too, we disagree with the dissent. Our dissenting colleague would have us apply the most common meaning of "retail store," which in his framing would exclude the fulfillment center. *See post* at 19–20. But even if the dissent is correct that "the more natural reading" is that an online retailer "sells" from its website, rather than from where the goods are stored and shipped -- a proposition we do not concede -- under well established Pennsylvania law, the most common usage does not control. Rather, we must discern the intent of the parties relative to the contract at issue. To do so, we consider parol evidence when both parties proffer reasonable interpretations of a disputed term based on the specific context of the case. *UPMC*, 129 A.3d at 463. Nor do we agree with the dissent that Appellee's reading would render "any facility affiliated with a company that sells things . . . a retail store." *Post* at 20. Appellee's proffered meaning is simple and reasonable: A facility is a "retail store" if it fulfills orders directly from consumers. Warehouses do not always fulfill orders, so they will not always be retail stores.

At a minimum, Appellee established a reasonable disagreement as to the ambiguity of the meaning of "retail store" in the context of this case. *See UPMC*, 129 A.3d at 463 (quoting *Murphy*, 777 A.2d at 430) ("A contract's terms are considered ambiguous 'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'"); *Titus*, 976 A.2d at 483 (same). But, in either case, as explained below, the district court did not reversibly err in holding that the Distribution Agreement encompasses the fulfillment center.

10

2.
"Store Door Delivery"

Next, we consider whether the term "store door delivery" is also reasonably susceptible to multiple readings and is, therefore, ambiguous. Appellant argues that this term is clear and does not encompass the fulfillment center. Instead, Appellant contends that "store door delivery" means delivery in tandem with the promotional obligations set out in Section 4.1 of the Distribution Agreement, and that because those services cannot be performed at the fulfillment center, it cannot accept goods by "store door delivery."

Appellant's argument begins by noting that Schedule B of the contract, which defines "Outlets," also states that the term "Outlets" does not include "any Outlets . . . serviced by methods other than store door delivery." Appellant's Br. at 30. Appellant then notes that Section 7.2 of the agreement requires the parties to notify one another if either learns that an Outlet has decided to accept delivery by a method other than "store door delivery." Thus, Appellant argues, Section 7.2 indicates that "store door delivery" means something more than *mere* delivery. Appellant then infers, without explanation, that Section 4.1 -- from which the words "store door delivery" are absent -- supplies the missing meaning that distinguishes that phrase from mere delivery.

Appellant's interpretation is nonsensical inasmuch as it means that "Outlets" is a theoretical set of facilities that contains a subset which, conveniently, the parties also call "Outlets." Consequently, Appellant's reasoning requires Schedule B to define "Outlets" as "retail stores" that accept goods by "store door delivery" and immediately thereafter to explain that some Outlets in fact *do not* accept "store door delivery," so that some facilities

11

must be both Outlets and non-Outlets. Additionally, there is zero evidence that the promotional obligations contained in Section 4.1 are connected in any material way with the phrase "store door delivery." And even if they were, Appellant's argument ignores the fact that Schedule B provides examples of the kinds of "Outlets or parts thereof" that do not accept goods by "store door delivery." Those include "street vendors," "concessions," and "vending machines," all of which conspicuously share the quality of lacking doors. J.A. 59.

Appellant's last ditch claim is that "if 'purchasing by store door delivery' means only 'delivery to the store and no more,' then the district court's interpretation impermissibly renders the phrase 'by store door delivery' superfluous." Appellant's Br. at 39–40. But this argument presents a false dichotomy by presuming that "store door delivery" must mean what Appellant proposes. That is, that our interpretive options are all or nothing.

Appellee proposes instead that "store door delivery" means delivery of products to the doors of a facility. In support, he directs us to the Dictionary of International Trade (9th ed. 2010), introduced at trial, which defines "store-door delivery" as "[t]he movement of goods to the consignee's place of business." J.A. 2435.

The one thing that is clear is that the parties have widely divergent views of the meaning of "store door delivery." But we need not decide whether this term is ambiguous. As we explain below, the outcome of this case is the same regardless because the district court reasonably found that the fulfillment center accepts goods by "store door delivery."

12

B.
Were the District Court's Interpretations
Clearly Erroneous?

Having determined that "retail store" is ambiguous in this context, and assuming that "store door delivery" is as well, we agree that the district court was correct to consider parol evidence as to their respective meanings. The only remaining question is whether the district court clearly erred in finding that those terms encompassed the fulfillment center. *See Titus*, 976 A.2d at 483 ("[A]mbiguous writings are interpreted by the finder of fact."); *Pine Res., LLC*, 917 F.3d at 813 (explaining that we may only reverse a district court's factual findings if we are convinced that a mistake has been made).

The district court heard testimony from six witnesses on the meaning of "retail store." First, Appellee testified that his course of performance with Appellant suggested that "retail store" means merely an entity that "sells product to [the final] consumer." J.A. 2432. Second, Sydney Taylor, who brokered distribution agreements for Appellant between 2009 and 2018 and was present when the Distribution Agreement at issue was executed, testified that "as of 2011," a "'retail store' is '[a]ny retail outlet that is offering goods for purchase by a consumer for their own consumption and/or use.'" *Id.* And Rick Smith and Paul Wiegand, both former employees of Appellant, each testified that "retail store" means "a facility that sells goods to consumers." *Id.* at 2433.

Only Dr. George and a current executive of Appellant, BJ Dissinger, testified that the fulfillment center is not a retail store, either as they understand the term or in standard industry practice and usage. Notably, neither could point to any authorities to support the latter proposition.

13

The district court thus found that the weight of the evidence supported the conclusion that the term "retail store" in this context "does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contact," and, therefore, that the fulfillment center "is a 'retail store' under the Distribution Agreement." J.A. 2434. The court found especially compelling that Appellant's reading "is essentially at odds with the people it employs and conducts business with . . . and frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with." *Id.*

The district court's analysis of "store door delivery" unfolded similarly. First, as noted above, the court acknowledged that the Dictionary of International Trade defines "store-door delivery" as "[t]he movement of goods to the consignee's place of business." J.A. 2435. It also noted that Taylor and Smith testified that the term meant "simply delivery to a retail outlet for sale to the consumer" and that Section 4.1 had nothing to do with the meaning of "store door delivery." *Id.* at 2434. And the district court also placed emphasis on Weigand's testimony that in a role pre-dating his time with Appellant, he was required to deliver by "store door delivery" to a fulfillment center like the one at issue in this case -- though of course, without the robots to which Appellant accords so much importance.

Appellant again relied solely on testimony from Dissinger and Dr. George that in their experience and in standard industry usage, "store door delivery" does not encompass the fulfillment center.

This time, however, Dr. George claimed to find support in a trade publication. That source, he claimed, proves that "[t]he key to [store door delivery] is what happens in

14

stores," not at their loading docks.  J.A. 2147.  But the article he relied upon explains that "direct store delivery" -- which he presumes to be a synonym of "store door delivery" -- is a broadly used term, the meaning of which varies by context.  *See* Willard Bishop, Optimizing the Value of Integrated DSD, 1 (2011) ("While the acronym DSD [direct store delivery] is broadly used, the meaning can vary.  For some it is an umbrella term covering all the product arriving at a store that didn't come through the retailer's own warehouse or primary wholesaler.") [https://perma.cc/WZ7F-JJD8].  Dr. George's assertion that the meaning varies is awkward given Appellant's claim that "store door delivery" is clear and unambiguous.  At the same time, this argument manages to be entirely self-defeating, as the article advocates for the broad adoption of "Fully Integrated [Store Door Delivery]," which it explains is a new form of the service that "gets its additional power" by combining ordering, warehousing, delivery, merchandising, and coordinating -- that is, the Section 4.1 services that Appellant claims define "store door delivery" in the first place.  *Id*.  In the end, both Dr. George and Dissinger conceded that a distributor could complete "store door delivery" without performing *any* of the tasks listed in Section 4.1 because the recipients would always retain the right to refuse those additional services.  That concession cannot be squared with Appellant's position.

Here too, the district court found that Appellee has the better case.  It reasoned that, as with "retail store," Appellant had offered a "recently contrived" and "conveniently malleable reading" to reach its desired outcome.  J.A. 2438–39.  And in contrast with Appellant's convoluted explanation, the court observed, "the language of the provision . . . itself strongly suggests that [a distributor] need not do more than deliver product to a retail

15

store for his conduct to constitute 'store door delivery,'" a reading which comported with testimony from several of Appellant's former employees. *Id.* at 2438–40.

All told, we are not left with the "definite and firm conviction" that the district court erred in its interpretation of these terms. *See In re Parker*, 141 F.4th at 587. Rather, the evidence overwhelmingly supports the district court's conclusions. First, the plain text of the Distribution Agreement could fairly be read to support that conclusion. Moreover, several of Appellant's former employees testified in support of the same. This conclusion is also supported by external authorities, including one cited by Appellant. Finally, Appellant offers only confusing, counter-intuitive, and contradictory evidence to the contrary.

We are thus compelled to affirm the district court's finding that the fulfillment center is a "retail store" that accepts goods by "store door delivery." Consequently, we hold that the fulfillment center is an "Outlet" within the meaning of the parties' Distribution Agreement and that Appellee has the exclusive right to distribute Appellant's products to the center.

IV.

For the reasons detailed herein, the district court is

*AFFIRMED*.

16

RUSHING, Circuit Judge, concurring:

I agree that the district court did not reversibly err in concluding that the Distribution Agreement encompasses the fulfillment center. The district court found that a retail store is "a place of business that sells goods directly to the consumer." J.A. 2434. I'm inclined to think that description embodies the ordinary, unambiguous meaning of the term. *See*, *e.g.*, *Retail Store*, *The Dictionary of Retailing* (1985) ("A business which regularly offers goods for sale to the ultimate consumer. A retail store buys, stores, promotes, and sells the merchandise."); *Store*, *American Heritage Dictionary of the English Language* (5th ed. 2011) ("1. A place where merchandise is offered for sale; a shop . . . ."); *Retail*, *American Heritage Dictionary of the English Language* (5th ed. 2011) (defining "retail," in its adjective form, as "[o]f, relating to, or engaged in the sale of goods or commodities at retail" and, in its noun form, as "[t]he sale of goods or commodities in small quantities directly to consumers"); *Store*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2011) (defining "store," in relevant part, as "a business establishment where usu[ally] diversified goods are kept for retail sale"); *Retail*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2011) (defining "retail," in its adjective form, as "of, relating to, or engaged in the sale of commodities at retail" and, in its noun form, as "the sale of commodities or goods in small quantities to ultimate consumers"). That definition is broad enough to include the fulfillment center. And, as the majority opinion reasons, the district court did not err in determining the meaning and application of the ambiguous term "store door delivery." With that explanation, I am pleased to concur in the majority opinion.

17

DIAZ, Chief Judge, dissenting:

Is an automated grocery fulfillment center a retail store? If you asked an ordinary person that question, they'd say no. But—as did the district court—my colleagues contort this easy question into a hard one. I would apply the term's plain meaning, as Pennsylvania law requires.

Because the Kroger-Ocado Automated Fulfillment Center doesn't primarily sell merchandise to ultimate consumers, I'd hold that it isn't a retail store. And I would reverse the district court's judgment.[1]

When a contract is "clear and unambiguous," Pennsylvania courts instruct us to limit our review to its four corners. *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). It's true that we must look to context to make that call. But we "may not rewrite the contract for the purpose of accomplishing that which . . . may appear proper . . . or remake a contract, under the guise of construction, because it later appears that a different agreement should have been consummated in the first instance." *Id.* at 662 (quoting 17A C.J.S. Contracts § 296(3)). Context didn't make this contract ambiguous; a context merely arose where the plain language of the contract didn't suit one party's desired outcome.

When a term is unambiguous, we use its "accepted and plain meaning." *Willison v. Consolidation Coal Co.*, 637 A.2d 979, 982 (Pa. 1994); *see also Kvaerner Metals Div. of*

---

[1] The district court appropriately found "store door delivery" ambiguous and considered definitions from trade usage dictionaries. It then reasonably applied one such definition to these facts. But because the Center needed to be both a retail store and serviced by store door delivery to count as an Outlet, I'd still reverse the judgment.

18

*Kvaerner U.S., Inc. v. Com. Union Ins. Co*, 908 A.2d 888, 897 (Pa. 2006)("Words of common usage . . . are construed according to their natural, plain, and ordinary sense." The district court erred in finding "retail store" ambiguous (and by doing so based on extrinsic evidence). It should have applied the term's plain meaning.

Pennsylvania courts consult dictionary definitions to determine the ordinary meanings of unambiguous terms. *Id.* at 897–98. Merriam-Webster defines "retail store" as "a place of business . . . in which merchandise is primarily sold to ultimate consumers." *Retail store*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/retailstore [https://perma.cc/R29D-5TQM]. In other words, a retail store is a place that sells things to customers.[2]

The district court need not have gone further. Rather than hold a trial on the meaning of "retail store," the district court should have instead applied its plain meaning to the Center. And this case should have turned on whether the Center primarily sells goods to ultimate consumers.

It does not. The Center—a large, automated warehouse—*ships* products to Kroger and Harris Teeter stores, other warehouses, and sometimes, to ultimate consumers. Even assuming shipping products to consumers counts as "selling" them, that's a small part of the activities the Center supports. The Center's primary business is storing and shipping.

---

[2] Judge Rushing offers other dictionary definitions. I'd rely on the dictionary definition promoted by Davis, but the same result follows if we adopted any common-sense definition of "retail store." None of them reasonably encompass the Center.

19

But the more natural reading of "sell" means something more than just shipping. When a person buys groceries online (say, at Kroger.com), they'd ordinarily think of the website as the seller, not the warehouse that stores and ships the items.

Indeed, Kroger online customers in the Mid-Atlantic region might be surprised to learn that their groceries come from the Center, not their local store. That Kroger is a grocery retailer doesn't mean that its shipping warehouses count as retail stores. The logical end of that view would mean that any facility affiliated with a company that sells things is a retail store. That can't be right.

Plain meaning doesn't always tell the full story. Even ordinary terms can apply to facts in ways that surprise us. But not here. By relying on improper extrinsic evidence, the district court gerrymandered a bespoke definition of retail store to accommodate the Center.[3] Because Pennsylvania law doesn't justify that move, I would reverse.

Put succinctly: "It's just a warehouse." J.A. 2036. I dissent.

---

[3] My colleagues offer yet another bespoke definition: any facility that "fulfills orders directly from consumers." *See ante* at 10. Davis has never proffered that meaning, nor did the district court.

20